v.

**MINNESOTA DEPARTMENT
OF HUMAN SERVICES,
Respondent.**

No. A11–1831.

Supreme Court of Minnesota.

May 29, 2013.

Julie H. Firestone, Briggs and Morgan, P.A., Minneapolis, MN, for appellant.

Lori Swanson, Attorney General, Patricia A. Sonnenberg, Assistant Attorney General, Saint Paul, MN, for respondent.

Barnett I. Rosenfield, Justin M. Page, Pamela S. Hoopes, Minneapolis, MN, for amicus curiae Mid–Minnesota Legal Aid, Minnesota Disability Law Center.

## OPINION

DIETZEN, Justice.

This case requires us to determine whether a person who is physically able to move without assistance, but who lacks the ability to direct his movement to a specific location, has a dependency in "mobility" under Minn.Stat. § 256B.0659 (2012). Appellant A.A.A. challenges the decision of the Commissioner of the Minnesota Department of Human Services ("DHS"), who found that appellant is not dependent in "mobility," and therefore reduced his authorized personal care assistant ("PCA") services covered through the Minnesota Medical Assistance program. The district court reversed the Commissioner's decision, concluding that the statute does not require appellant to be physically incapable of mobility to be eligible for covered services. The court of appeals reversed the district court and reinstated the Commissioner's decision because appellant is physically able to begin and complete moving from place to place without assistance. We affirm the court of appeals.

Appellant is a nine-year-old boy with severe autism, epilepsy, chronic seizures, chronic sinusitis and otitis, and sleep disturbances. Before 2010, appellant qualified for and received PCA services for dependencies in five activities of daily living ("ADLs"). They were dressing, grooming, bathing, eating, and toileting. He received additional PCA services because he had, among other things, behaviors resulting from cognitive deficits. Because appellant was determined to be independent in the activities of transfers, positioning, and mobility, appellant received no PCA services for those ADLs.

On March 18, 2010, a public health nurse ("PHN") visited appellant at his apartment to conduct a health care assessment of him, and then to determine his home care rating under the 2009 amendments to Minn.Stat. §§ 256B.0652, 256B.0659. *See* Act of May 14, 2009, ch. 79, art. 8, §§ 20, 21, 28, 31, 2009 Minn. Laws 690, 856–57, 875–90. The PHN assessed appellant as dependent in the same five ADLs for which he was previously found to be dependent; and not dependent in same three ADLs for which he was previously found to be independent. A base amount of PCA services per day was derived from appellant's assessed dependencies, his behaviors, and his complex medical needs. The PHN also determined that appellant was entitled to additional PCA services due to certain behaviors, including increased vulnerability due to cognitive deficits, resistance to care, and aggression; his complex health needs due to his seizure disorder; and his critical dependencies in the ADLs of eating and toileting.

Based upon the assessment, the PHN recommended that appellant receive 390 minutes (6 hours, 30 minutes) per day of PCA time.[1] The decrease from the previous PCA time of 462 minutes (7 hours 42 minutes) per day was due to the statutory amendments that limited PCA time for behavioral needs to 90 minutes per day. *See* Minn.Stat. §§ 256B.0652, subd. 6(c)(3) (2012), 256B.0659, subd. 4(d) (30 minutes per day for each of the three statutorily-defined behaviors). As a result of the PHN's assessment, DHS notified appellant on March 24, 2010, that his authorized PCA services would be reduced from 462 minutes to 390 minutes per day.

Appellant challenged the reduction in his PCA time, and a DHS judge conducted an evidentiary hearing at which appellant's father, mother, and physician testified. Following the hearing, the judge recommended that appellant's PCA time be increased to 450 minutes per day because appellant "does not respond to verbal commands, [and] when he is walking, direct physical contact must continuously be maintained to cue and constantly maintain supervision." Pursuant to Minn.Stat. § 256B.045, subd. 5 (2012), the Commissioner rejected the recommendation of the judge and affirmed DHS's recommendation that appellant's PCA time be reduced to 390 minutes per day. The Commissioner concluded that appellant "does not have a dependency in mobility because he is physically able to walk" and his need "to be supervised so that he does not harm himself while out walking in public" is "properly accounted for by the daily PCA time allotted for his behaviors."

On appeal, the district court reversed the Commissioner's decision, concluding that appellant was entitled to 450 minutes of PCA time per day. The court concluded that because appellant requires direct physical contact to maintain control while walking in public, he "must be continuously cued and constantly supervised" and therefore has a dependency in mobility. The court of appeals reversed, determining that the plain meaning of mobility is "'moving' (from place to place)." *A.A.A. v. Minn. Dep't of Human Servs.*, 818 N.W.2d 552, 556 (Minn.App.2012). The

---

1. The PHN determined that appellant's home care rating was "U," which applies to persons with dependencies in four to six ADLs and one or more complex health-related needs. The base amount of PCA time per day for a "U" rating is 210 minutes. Additionally, appellant received an additional 60 minutes per day of PCA time for his two critical ADL dependencies (30 minutes per dependency), an additional 30 minutes for his one complex health need, and an additional 90 minutes for his three Level I behaviors (30 minutes per behavior). *See* Minn.Stat. § 256B.0652, subd. 6(c) (2012).

court of appeals concluded that because appellant is "able to begin and complete moving from place to place without assistance, and he does not need cuing and constant supervision or hands-on assistance to do so," he is not dependent in the ADL of mobility. *Id.* Consequently, the court of appeals concluded that appellant was entitled to only 390 minutes of PCA time per day. *Id.*

## I.

Appellant argues that the court of appeals erred in concluding that he is not dependent in mobility under Minn.Stat. § 256B.0659, subd. 2(b)(6). According to appellant, he needs cuing and constant supervision to complete the task of mobility within the meaning of section 256B.0659, subdivision 4(b)(1), and therefore he is dependent in the activity of mobility. More specifically, appellant argues that his increased vulnerability when he is physically mobile is due to his cognitive deficits, which render him dependent in mobility.

The interpretation of a statute is a question of law that we review de novo. *Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 758 (Minn.2010). When interpreting a statute we give the words and phrases of the statute their plain and ordinary meaning. *Emerson v. Sch. Bd. of Indep. Sch. Dist. 199,* 809 N.W.2d 679, 682 (Minn.2012). Moreover, we examine the language of a statute as a whole to give effect to all of its provisions. Minn.Stat. § 645.16 (2012). The first step in interpreting a statute is to examine the language to determine whether it is clear and unambiguous. *Id.* A statute is ambiguous if, as applied to the facts of the case, it is susceptible to more than one reasonable interpretation. *Staab v. Diocese of St. Cloud,* 813 N.W.2d 68, 72–73 (Minn.2012). If the statute is clear and not ambiguous, then we apply its plain and ordinary mean-

ing. *Emerson,* 809 N.W.2d at 682. But if the statute is ambiguous, then we may look beyond the statutory language to determine legislative intent. *See generally* Minn.Stat. § 645.16.

To answer the question presented, we will first review the statutory framework governing the personal care assistance program to provide context. *See Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (stating that we examine statutes as a whole and interpret each section in light of surrounding sections to avoid conflicting interpretations). Generally, Minnesota provides medical assistance "for needy persons whose resources are not adequate to meet the cost" of a variety of medical services. Minn. Stat. § 256B.01 (2012). PCA services are part of the state medical assistance program. When a person is determined to be eligible for PCA services, that person may be eligible for medical assistance payments. Minn.Stat. § 256B.0659, subd. 2. The eligible needs for which PCA services and reimbursement are available are: (1) activities of daily living; (2) health-related procedures and tasks; and (3) observation and redirection of behaviors. *Id.,* subd. 2(a)(1)-(3). It is the activities of daily living that are at issue in this case.

The methodology for determining the PCA services available and the amount of time eligible for reimbursement changed in 2009. Act of May 14, 2009, ch. 79, art. 8, §§ 20, 21, 28, 31, 2009 Minn. Laws 690, 856–57, 875–90. Prior to the 2009 amendments, the statute provided that "[t]he amount and type of services authorized shall be based on an assessment of the recipient's needs" in nineteen defined areas. Minn.Stat. § 256B.0655, subd. 2(c) (2008). After the 2009 amendments, the statutes currently authorize a specified amount of time eligible for PCA services reimbursement based upon: (1) the

number of dependencies in ADLs, (2) the presence of complex health-related needs, and (3) the presence of aggressive or destructive behavior, which combine to determine an overall home care rating for the recipient. Minn.Stat. §§ 256B.0652, subd. 6(b), 256B.0659, subd. 1(c) (2012). Additional time, subject to a daily limit, is authorized for each critical ADL, complex health-related function, and behavioral issue. Minn.Stat. § 256B.0652, subd. 6(c) (2012).

The Commissioner follows a procedure outlined in the statutes to determine whether an individual is entitled to PCA services that are eligible for payment under the medical assistance program. Minn.Stat. §§ 256B.0652 (2012), 256B.0659, subd. 2. Initially, a PHN conducts a home visit to assess the recipient's need for services. Minn.Stat. § 256B.0659, subds. 3a, 4. The PHN prepares a report addressing (1) the total number of dependencies in activities of daily living; (2) the presence of complex health-related needs; and (3) the presence of Level I behaviors. Minn. Stat. §§ 256B.0652, subd. 6; 256B.0659, subds. 4, 6. The eligible ADLs are (1) dressing; (2) grooming; (3) bathing; (4) eating; (5) transfers; (6) mobility; (7) positioning; and (8) toileting. Minn.Stat. § 256B.0659, subd. 2(b); *see also* Minn. Stat. § 256B.0659, subd. 1(b). Transfers, mobility, eating, and toileting are identified as critical ADLs. Minn.Stat. § 256B.0659, subd. 1(e). A "dependency" in an ADL exists if the recipient "requires assistance to begin and complete" the designated ADL. Minn.Stat. § 256B.0659, subd. 1(f). Additionally, Level I behaviors qualify for PCA services if the recipient needs assistance at least four times per week for (1)

physical aggression or property destruction that requires an immediate response; (2) "increased vulnerability due to cognitive deficits or socially inappropriate behavior"; or (3) verbal aggression or resistance that increases the time needed for ADLs. Minn.Stat. § 256B.0659, subd. 4(d)(1)-(3).

The Commissioner, or her designee, uses the information gathered in the home assessment to determine the recipient's home care rating, which translates to a daily amount of time for PCA services authorized and eligible for reimbursement. Minn.Stat. § 256B.0652, subd. 6.

## II.

With the statutory framework for personal care assistance services in mind, we return to the question of interpreting the meaning of "mobility" in section 256B.0659, subdivision 2(b)(6). Specifically, we must determine whether appellant, who is physically able to move without assistance but who has behavioral conditions that impair his ability to direct his movement to a specific location, has a dependency in mobility under the statute.[2]

Chapter 256B does not explicitly define "mobility," but two provisions in section 256B.0659 are relevant to determining its meaning: Minn.Stat. § 256B.0659, subds. 2 & 4. The starting point is the statutory description of the ADL of mobility in section 256B.0659, subdivision 2(b)(6). Subdivision 2(b)(6) describes "mobility" as "including assistance with ambulation, including use of a wheelchair." Minn.Stat. § 256B.0659, subd. 2(b)(6). It further states that "[m]obility does not include

**2.** The dissent attempts to reframe the issue before us as whether appellant should be awarded more minutes per day of PCA services. We agree that appellant has significant behavioral issues that would benefit from more personal care assistance. But that is not the issue before us. Instead, we are asked to interpret the various provisions of section 256B.0659 as a whole, particularly subdivisions 2 and 4, to determine their meaning. The dissent, however, declines to reach or decide that issue.

providing transportation for a recipient." *Id.*

The plain and ordinary meaning of "mobility" contemplates physical activity. The definition of "mobility" is "[t]he quality or state of being mobile." *The American Heritage Dictionary of the English Language* 1129 (4th ed.2000). Other definitions of "mobile" include "[c]apable of moving or of being moved readily from place to place," *id.,* and "capable of moving or being moved," *Merriam–Webster's Collegiate Dictionary* 745 (10th ed.2001). The root verb "move" is defined as "[t]o change in position from one point to another," *The American Heritage Dictionary of the English Language* at 1156, and "to go or pass to another place or in a certain direction with a continuous motion," *Merriam–Webster's Collegiate Dictionary* at 760.

Moreover, the word used in subdivision 2(b)(6) to describe "mobility" is "ambulation," which also contemplates physical activity. Minn.Stat. § 256B.0659, subd. 2(b)(6). Specifically, the word "ambulate," which is the root of "ambulation," means "[t]o walk from place to place; move about." *The American Heritage Dictionary of the English Language* at 57. Other dictionaries define "ambulatory" as "[a]ble to walk," *Black's Law Dictionary* 94 (9th ed.2009), "moving from place to place," *The American Heritage Dictionary of the English Language* at 57, and "[o]f, relating to, or adapted for walking," *Merriam–Webster's Collegiate Dictionary* at 36.

■ We conclude that the plain and ordinary meaning of "mobility" in section 256B.0659, subdivision 2(b)(6) contemplates the physical ability to go from one place to another. This interpretation is consistent with the common meaning of "mobility" to physically move from one point to another point. It is also supported by the word "ambulation" contained in the description of "mobility." Minn. Stat. § 256B.0659, subd. 2(b)(6). Consequently, "mobility" appears to be limited to the physical ability to move between two points.

Appellant acknowledges that he is physically capable of walking independently. Relying on section 256B.0659, subdivision 4(b), appellant argues that a mobility dependency is not limited to physical limitations in accomplishing this task, but can include a cognitive disability.[3] Thus, we must examine the applicability of section 256B.0659, subdivision 4(b) which states that "a person must be assessed as dependent in an activity of daily living based on the person's daily need ... for: (i) cuing and constant supervision to complete the task; or (ii) hands-on assistance to complete the task." Minn.Stat. § 256B.0659, subd. 4(b)(1). Appellant argues that his need for cuing, constant supervision, and hands-on assistance "to complete the [mobility] task" confirms that a mobility dependency includes the lack of cognitive ability to begin or complete movement to a designated place, and that he requires supervision to avoid injury or danger. The Commissioner contends that appellant is

**3.** In this case we decide only the question of whether an individual who is physically able to move but lacks the cognitive ability to direct his movement to a specific location is dependent in mobility under Minn.Stat. § 256B.0659. Specifically, we do not decide whether an individual, unlike appellant, who lacks the physical ability to move due to a cognitive deficit has a dependency in mobili-

ty. For example, unlike this case, a person with a severe medical condition may have the cognitive ability to desire to move to a specific location, but lacks the physical ability to act on that desire. A case in which the individual's physical movement is impaired presents a question that is not before us, and we decline to decide it.

physically capable of completing the task of walking or running without "cuing and constant supervision"[4] or "hands-on assistance." Minn.Stat. § 256B.0659, subd. 4(b)(1). Additionally, the Commissioner contends appellant's need for supervision is a behavioral issue that is separately assessed under the statute. *See* Minn. Stat. § 256B.0659, subd. 4(d).

We conclude that appellant's argument that he satisfies the "cuing and constant supervision to complete the task" element of section 256B.0659, subdivision 4(b)(1)(i) lacks merit. Appellant's inability to respond to "cuing" when mobile is supported in the record. Appellant's father testified that A.A.A. does not respond to verbal directions so cuing him, or giving him verbal instructions, is ineffective. Specifically, when appellant is instructed to move away from an unsafe situation, he does not understand the instruction and therefore cannot comply. Because appellant does not satisfy the cuing portion of the statute, his claim under subdivision 4(b)(1)(i) fails.

But appellant's claim under section 256B.0659, subdivision 4(b)(1)(ii) is less clear. Appellant argues that he needs "hands-on assistance to complete the task" and therefore is dependent in mobility. *Id.* The phrase "hands-on assistance" arguably covers appellant's situation. Indeed, the Commissioner concedes that appellant needs supervision and redirection when he is mobile. But the Commissioner argues that his need for supervision is solely a Level I behavioral issue. Thus, the question becomes whether the "hands-on assistance to complete the task" in subdivision 4(b)(1)(ii) is limited to the physical ability to complete the task, or whether it also contemplates appellant's increased vulner-

ability when he is physically mobile due to his cognitive deficits.

We conclude that the phrase "hands-on assistance to complete the task" in section 256B.0659, subdivision 4(b)(1)(ii) when applied to "mobility" in subdivision 2 is ambiguous. On the one hand, it is reasonable to conclude that the phrase "hands-on assistance to complete the task" refers to the physical ability to move from one location to another. But it is also reasonable that the phrase includes both the physical and the cognitive ability to move from one location to another location.

■■■ When interpreting a statute that is ambiguous, we may examine factors outside the language of the statute to determine legislative intent, but our overarching goal is to determine the intent of the Legislature. *Staab,* 813 N.W.2d at 72–73; Minn.Stat. § 645.16. In doing so, we examine the statute as a whole so that no word or phrase is superfluous. *Staab,* 813 N.W.2d at 72; Minn.Stat. § 645.16. Additionally, we may consider, among other things, the administrative interpretation of the statute, and the occasion and necessity for the law. Minn.Stat. § 645.16, subds. (1), (8).

We conclude that the Commissioner's interpretation of the phrase "hands-on assistance to complete the task" in Minn. Stat. § 256B.0659, subd. 4(b)(1)(ii)—the physical ability to complete the task of moving from one location to another location—is reasonable and supported by the plain meaning of the statute. Section 256B.0659 requires the Commissioner to separately assess the ADL of "mobility" and Level I behavioral issues. *Compare* Minn.Stat. § 256B.0659, subd. 2(b), *with* Minn.Stat. § 256B.0659, subd. 4(d). Ap-

---

**4.** Following the 2009 legislative amendments, the Commissioner issued instructions and guidelines for PCA services that, among other things, defined "[c]uing" as "[v]erbal step-by-step instructions to start and complete all steps of the task."

pellant's proposed interpretation of the statute would result in separate assessments under subdivisions 2(b) and 4(d) for the same PCA services arising out of his increased vulnerability when physically mobile due to cognitive deficits.

We recognize that appellant's ability to "complete the task," Minn.Stat. § 256B.0659, subd. 4(b)(1), of mobility is complicated by his behavioral conditions. He has run away from his parents and other supervising adults on multiple occasions, putting himself at risk of injury due to his inability to heed the risks of, for example, traffic. But the need for supervision to limit or avoid this "increased vulnerability" is due to appellant's "cognitive deficits." Minn.Stat. § 256B.0659, subd. 4(d)(2); *see also* Minn.Stat. § 256B.0659, subd. 2(a)(3) (defining eligibility for PCA services for assistance with "observation and redirection of behaviors"). Further, if "mobility" is construed to encompass physical dependencies and increased vulnerability due to cognitive deficits, then the statutory methodology would potentially allow for calculation of additional time in two categories, ADLs and Level I behavior issues, for the same mobility task. *See* Minn.Stat. § 256B.0652, subd. 6(c).

The Commissioner has published administrative guidelines, which are consistent with her interpretation. We have stated that when a statute is ambiguous, we give deference to the administrative interpretation of the relevant statute by a state agency if the agency is charged with the responsibility of applying the statute on a statewide basis and its interpretation is reasonable. *Mammenga v. State Dep't of Human Servs.*, 442 N.W.2d 786, 792 (Minn.1989). The Commissioner is charged with the responsibility of administering the Medical Assistance and PCA programs, including the administration

and interpretation of section 256B.0659. *See id.;* Minn.Stat. § 256B.0652, subds. 1–2. Moreover, these programs are part of "a complex regulatory scheme that requires the technical expertise of the Commissioner to interpret and administer." *Greene v. Comm'r of Minn. Dep't of Human Servs.*, 755 N.W.2d 713, 722 (Minn. 2008).

Additionally, the Commissioner's interpretation is consistent with the occasion and necessity for the 2009 amendments. *See* Minn.Stat. § 645.16(1). The amendments are based upon recommendations by the Office of the Legislative Auditor that the State develop guidelines for PCA assessors, particularly in the area of behaviors, to "identify ranges of time that may be appropriate to recommend for certain activities" and to "clarify circumstances that may justify deviation from guidelines." Office of the Legislative Auditor, *Evaluation Report: Personal Care Assistance* 39 (Jan.2009); *see* Minn.Stat. § 645.16, subds. 1–2, 4. The Legislative Auditor's recommendation was based on the January 2009 report he submitted to the Legislature concluding that "[b]etween fiscal years 2002 and 2007, estimated publicly funded personal care assistance (PCA) expenditures grew by 164 percent"; that "Minnesota has not implemented sufficient controls and guidance to ensure that assessments of individuals' need for PCA services are reasonably consistent around the state"; and that "[p]ersonal care services remain unacceptably vulnerable to fraud and abuse." Office of the Legislative Auditor, *Evaluation Report: Personal Care Assistance* ix (Jan.2009).

Pursuant to the 2009 amendments, the Commissioner has published guidelines to ensure that PCA assessments are reasonably consistent around the state.[5] We con-

---

**5.** Guidelines published by DHS state that a personal care assistant "may assist the person

clude that the Commissioner's interpretation of the statute, to limit the ADL of "mobility" to the physical ability to move from one location to another location and requires a separate assessment for Level I behavioral needs, is consistent with the occasion and necessity for the amendments. Specifically, the Commissioner's interpretation provides a straightforward interpretation of the statute that may be uniformly and consistently applied across the state.

In summary, we conclude that the phrase "hands-on assistance to complete the task" in section 256B.0659, subdivision 4(b)(1)(ii), with reference to the task of mobility, means the physical ability to complete the activity of mobility. Consequently, we interpret the ADL of "mobility" in section 256B.0659, subdivision 2(b)(6) to mean the physical ability to move from one location to another location. Based upon the facts of this case, the ADL of mobility does not include the increased vulnerability of an individual when physically mobile due to cognitive deficits. Instead, the increased vulnerability of appellant when physically mobile due to cognitive deficits is separately assessed as a Level I behavior issue in subdivision 4(d).

### III.

Having determined that mobility means simply the physical ability to move from one location to another, we next review the Commissioner's application of the statute to the reduction in appellant's PCA hours from 462 minutes per day to 390 minutes per day. Notably, the 2009 amendments, among other things, reduced the amount of time for Level I behavioral needs for which a recipient is eligible for reimbursement from the amount available prior to the amendments. When he was last evaluated prior to the amendments, appellant was determined to have the requisite physical ability in the ADL of mobility and therefore was not dependent in that activity.

 The Commissioner's determination to reduce appellant's PCA time because appellant is not dependent in mobility is well supported by the record. The guidelines published by DHS indicate that an individual with the functional ability to ambulate is not dependent in the ADL of mobility. Appellant's ability to walk and run without assistance is undisputed. Further, the DHS judge found that "[a]ppellant is constantly active and makes frequent attempts [to] leave a room or wander away." Finally, during the evidentiary hearing, the DHS judge observed that appellant is "clearly able to ambulate, probably ambulates far too much." The record therefore supports the Commissioner's conclusion that appellant can physically ambulate without assistance and therefore is not dependent in the ADL of mobility.

with the following ADLs: ... Mobility—Assistance with ambulation." *Personal Care Assistance: PCA services*, Minn. Dep't of Human Servs., http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=dhs16_147676# (last updated Nov. 6, 2012). The guidelines answer the question "if a child runs out of the yard when not supervised, is this considered an ADL in mobility?" with the response, "[n]o. This example is not an ADL dependency in mobility. If the individual has the functional ability to perform the activity, move, walk or ambulate, they would not get a dependency in an ADL." *PCA Frequently Asked Questions*, Minn. Dep't of Human Servs., http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=dhs16_147772# P17_2616 (last updated June 30, 2011).

## IV.

In summary, we conclude that the word "mobility" in Minn.Stat. § 256B.0659, subd. 2(b)(6) means the physical ability to move from one location to another location. The word "mobility" in subdivision 2(b)(6) does not contemplate the increased vulnerability of an individual when physically mobile due to cognitive deficits because that is separately assessed in subdivision 4(d). Further, the Commissioner's interpretation of the phrase "hands-on assistance to complete the task" in section 256B.0659, subdivision 4(b)(1)(ii), with reference to the task of mobility, to mean the physical ability to move from one location to another location, is reasonable. We are persuaded that the statutes at issue are technical in nature, and the Commissioner's interpretation is supported by the plain and ordinary meaning of "mobility." Thus, we do not read "to complete the task" to extend to the cognitive ability to reason how to move from one location to another location. Finally, the record supports the Commissioner's decision that appellant can ambulate without physical assistance and therefore is not dependent in the ADL of mobility. Accordingly, we affirm the court of appeals' decision to uphold the Commissioner's determination.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.

ANDERSON, G. BARRY, J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. I conclude that both the Human Services judge and the Hennepin County District Court got it right on both the facts and the law when they concluded that A.A.A. is entitled to a total of 450 minutes per day of authorized Personal Care Assistant (PCA) services. Therefore, I would reverse the Minnesota Court of Appeals and reinstate the Hennepin County District Court's order.

Before discussing the reasons why I disagree with the result reached by the majority, a brief review of the factual and procedural history of A.A.A.'s condition and treatment is in order. A.A.A. is a nine-year-old child who is severely autistic and suffers from epilepsy, chronic seizures, sleep disturbances, and behavioral difficulties. He is non-verbal, does not respond to oral instructions, and needs 24–hour supervision. A.A.A. has to be physically moved away from dangerous situations and will try to run away if someone is not holding his hand. A.A.A. ran away 20 times over a two-month period. A.A.A. receives state assistance to help pay for his medical care. Before 2010, A.A.A. received 462 minutes per day, or approximately 7.5 hours, of PCA services based on the time it took to complete certain tasks.

The Minnesota Legislature amended the statutes governing PCA services in 2009. Act of May 14, 2009, ch. 79, art. 8 §§ 20, 21, 28, 31, 2009 Minn. Laws 690, 856–57, 875–900. The amended statutes set specific amounts of PCA services that can be provided based on an individual's dependent activities of daily living (ADLs), complex health needs, and Level I behaviors. Minn.Stat. § 256B.0652, subd. 6 (2012). The amended statute applicable to this case authorizes recipients to receive a specific base amount of PCA services determined by their respective home care rating. *Id.*, subd. 6(b).

Additional PCA services time is added through the assessment and identification of the following: (1) 30 additional minutes per day for a dependency in each critical activity of daily living as defined in Minn. Stat. § 256B.0659 (2012); (2) 30 additional

minutes per day for each complex health-related function as defined in section 256B.0659; and (3) 30 additional minutes per day for each behavior issue as defined in section 256B.0659, subdivision 4(d). Minn.Stat. § 256B.0652, subd. 6(c).

ADLs include dressing, grooming/hygiene, bathing, eating, transfers, mobility, positioning, and toileting. Minn.Stat. § 256B.0659, subd. 1(b). Critical ADLs include eating, transfers, mobility, and toileting. *Id.*, subd. 1(e). A person "must" be assessed as dependent in an ADL based on the need for "(i) cuing and constant supervision to complete the task; or (ii) hands-on assistance to complete the task." *Id.*, subd. 4.

In March 2010, a public health nurse (PHN) conducted a PCA reassessment of A.A.A. One week later, the Minnesota Department of Human Services Disability Services Division sent a notice to A.A.A's parents informing them that A.A.A.'s authorized PCA services would be reduced from 462 minutes to 390 minutes per day. A.A.A. filed an appeal of this decision on June 11, 2010. On August 17, 2010, an in-person administrative hearing was held before a Human Services judge during which the judge took testimony and accepted several exhibits into evidence.

Following this in-person administrative hearing, the judge made several specific findings with respect to A.A.A. The judge found that A.A.A. had cognitive deficits and behavior problems in general due to severe autism, mental retardation, and associated developmental delay. A.A.A. is completely nonverbal, has a "very limited safety awareness," is resistive to care, and, on a daily basis, requires constant supervision to ensure his own and others' safety. He requires hands-on assistance and/or cuing and constant supervision to complete most activities of daily living. He is easily frustrated and quick to engage in aggressive or otherwise inappropriate behaviors, including hitting his parents. In fact, during the in-person hearing, the judge saw A.A.A. strike his mother several times.

A.A.A. also hits and bites himself and others, pulls hair, bangs himself against walls, grabs others and "holds on hard" (the judge noted that A.A.A. is "very strong"), throws and destroys property, and routinely ingests non-food objects. The judge found that he will put "anything and everything into his mouth." Other socially inappropriate behaviors include disturbing and loud verbal screeching noises, invading the physical space of strangers, and obsessive thumb sucking. He has broken microwave and closet doors from obsessive, repeated opening and closing, and frequently allows the bathtub and sink to overflow. A.A.A. is constantly active and makes frequent attempts to leave a room or wander away from his care providers when in public.

Because A.A.A. does not respond to verbal commands, direct physical contact must continuously be maintained in order to cue him and to constantly maintain supervision of him when he is walking. The judge found that approximately one month before the in-person administrative hearing, the police had to be called when A.A.A. managed to evade his school bus driver and somehow made his way to downtown Minneapolis. He was missing for two hours. Fortunately, A.A.A. was not injured when he was located, although he had been spotted by a neighbor who said that when he fled from the school bus he ran into a street and paid no heed to traffic. A.A.A. also frequently has to be physically restrained to keep him from engaging in dangerous or harmful actions, such as touching a hot stove. A.A.A.'s physical problems include epilepsy, uncontrolled seizures provoked by febrile illness, and chronic sinusitis. In the month pre-

ceding the March 2010 reassessment, A.A.A. required emergency room treatment on two occasions for seizures and once for a nose and throat problem.

The PHN found that A.A.A. has five ADL dependencies, including two critical ADLs. The five ADLs are: dressing, grooming, bathing, eating, and toileting. At the hearing, counsel for A.A.A. argued that, because A.A.A. also requires hands-on assistance and cuing and constant supervision when he is walking, he has a sixth dependency regarding mobility. The judge agreed with this argument and found that A.A.A. has a sixth ADL regarding mobility.

The judge agreed with the PHN assessment that A.A.A. has one complex health-related need: neurological interventions as a result of seizures. But the judge also found that A.A.A. has congenital diseases that clearly create a need for significantly increased hands-on assistance regarding the six ADLs. The judge also found that A.A.A. has three Level I behaviors. Based upon the evidence as a whole, the judge found that A.A.A. continues to present his parents with significant behavioral challenges warranting a level of PCA services sufficient to afford A.A.A., his family, and others a modicum of safety and security.

After making the foregoing findings with respect to A.A.A., the judge made the following conclusions as to the amount of authorized PCA services to which A.A.A. is entitled:

a. A base rate of 210 minutes per day of PCA services based upon six ADL dependencies and the presence of complex health-related needs and Level I behaviors;

b. An additional 90 minutes (30 minutes each) for three critical ADLs;

c. An additional 60 minutes (30 minutes each) for two complex health-related needs; and

d. An additional 90 minutes (30 minutes each) for three behaviors;

e. Resulting in a total of 450 minutes (7 hours and 30 minutes) per day of authorized PCA services.

After the Human Services judge entered his findings and conclusion on October 21, 2010, the Commissioner of Human Services named a designee to review the judge's findings and conclusions. The Commissioner's designee, the Co–Chief Human Services judge, rejected the Human Services judge's recommendations. More specifically, the designee rejected six out of eight of the Human Service judge's conclusions. The designee concluded that A.A.A. had only five ADLs—not six—and that he had only one complex health-related need. The designee then reversed the Human Services judge, affirmed the Commissioner's original assessment, and awarded A.A.A. 390 minutes per day of PCA services.

When reversing the Human Service judge's decision, the Commissioner's designee accepted the Commissioner's view that A.A.A. is not dependent in mobility because he is physically capable of movement without assistance. The Commissioner noted that the PHN observed A.A.A. run laps around the room, move a chair to the front door, climb on the chair, and unlock the door and attempt to leave the residence. The Commissioner claimed that these behaviors clearly show that A.A.A. does not need hands-on assistance or cuing to move from one location to another; rather, it is his behaviors that require him to be supervised and redirected when necessary.

A.A.A. appealed to the Hennepin County District Court. The district court reversed the decision of the Commissioner

and essentially adopted the findings and conclusions of the Human Services judge and awarded A.A.A. 450 minutes per day of PCA services. The court found that the Commissioner's definition of a dependency in mobility failed to give effect to the plain meaning of the statute. The court concluded that the statute does not require A.A.A. to be physically incapable of performing the task to be dependent. Rather, the court said it is sufficient if A.A.A. needs either cuing and constant supervision *or* hands-on assistance to complete the task. *See* Minn.Stat. § 256B.0659, subd. 4(b)(1). The court went on to note that A.A.A. is constantly active and makes frequent attempts to leave a room or wander away from his care provider when in public. But because A.A.A. does not respond to verbal commands, he requires continuous direct physical contact when walking in public; in other words, he must be continuously cued and constantly supervised. The court then concluded that A.A.A. must receive an additional 30 minutes based on his dependency in mobility. The court went on to conclude that because A.A.A. has six instead of five ADLs under the statute, he has an additional complex health-related need and is entitled to another 30 minutes per day of authorized PCA services. *See* Minn.Stat. §§ 256B.0652, subd. 6(c)(2), 256B.0659, subd. 4(c)(8).

We generally defer to reasonable agency decisions. *In re Johnson,* 565 N.W.2d 432, 433 (Minn.1997); *see also In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater,* 731 N.W.2d 502, 514–15 (Minn.2007). But we retain the authority to review de novo errors of law which arise when an agency decision is based upon the meaning of words in a statute. *In re Denial of Eller Media Company's Applications for Outdoor Adver. Device Permits,* 664 N.W.2d 1, 7 (Minn.2003). We have said:

> When a decision turns on the meaning of words in a statute or regulation, a legal question is presented. In considering such questions of law, reviewing courts are not bound by the decision of the agency and need not defer to agency expertise.... If a regulation is ambiguous, agency interpretation will generally be upheld if it is reasonable. [But,] [n]o deference is given to the agency interpretation if the language of the regulation is clear and capable of understanding....

*St. Otto's Home v. Minn. Dep't of Human Servs.,* 437 N.W.2d 35, 39–40 (Minn.1989) (citations omitted); *see also Annandale,* 731 N.W.2d at 513–14. Our objective when interpreting the language of a statute is "to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2012). If that intent is clear from the plain and unambiguous language of the statute, we apply the plain meaning of the statute. *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn.2001).

Unlike the majority, I conclude that the statutory language with respect to mobility and behaviors is clear and capable of being easily understood. As a result I see no need to defer to the Department of Human Services for an interpretation of Minn.Stat. §§ 256B.0652, 256B.0659. I conclude that the Commissioner's definition of an ADL dependency in mobility fails to give effect to the plain meaning of the statute. In essence, the Commissioner fails to see the forest—the overall concept and intent of the statute—by focusing too narrowly on the trees—the isolated meaning of particular words. Therefore, when looking at Minn.Stat. § 256B.0659 as a whole, I conclude that when the plain meaning of the statute is understood and applied to A.A.A., he is entitled to a total of 450

minutes per day of authorized PCA services.

A dependency in an ADL is explicitly defined in the statute. It occurs when a person has a need on a daily basis for: "(i) cuing and constant supervision to complete the task or (ii) hands-on assistance to complete the task." Minn.Stat. § 256B.0659, subd. 4(b)(1) (emphasis added). Mobility is one type of ADL, defined to include "assistance with ambulation." Minn.Stat. § 256B.0659, subd. 2(b)(6). "Ambulate," the verb form of "ambulation," is defined as "to move from place to place." *Merriam Webster's Collegiate Dictionary* 36 (10th ed.1993).

As previously noted, the Commissioner and her designee concluded that A.A.A. is not dependent in mobility because he is physically capable of movement without assistance. But the Commissioner's definition of an ADL dependency in mobility fails to give effect to the plain meaning of the statute. The statute does not require A.A.A. to be physically incapable of performing a task in order to be dependent. As the district court said, under Minn. Stat § 256B.0659, subd. 4, "it is sufficient if A.A.A. needs either hands-on assistance *or* cuing and constant supervision to complete the task." Here, a key factor for interpretation is that the Legislature chose to use the word "or." It is a well-established rule of statutory construction that when the disjunctive "or" is used, only one of the listed factual situations needs to be present in order for the provisions to be satisfied. *Munger v. State,* 749 N.W.2d 335, 338 (Minn.2008).

It is beyond dispute that A.A.A. is constantly active and makes frequent attempts to leave a room or wander away from his care provider when in public. A.A.A. does not respond to verbal commands. In fact, the Human Services judge found that he is "completely non-verbal" and thus incapable in most instances of responding to verbal commands. He requires continuous direct contact when walking in public. When moving from place to place he must be supervised. A.A.A.'s father testified during the administrative hearing that if A.A.A. needs to move from one place to another, he must be moved by hand. In essence, A.A.A. must be continuously cued and constantly supervised, which is exactly what the statute requires to qualify for authorized PCA services. *See* Minn.Stat. § 256B.0659, subd. 4(b)(1)(i).

All of A.A.A.'s dependencies with the possible exception of toileting are related to behavior. The PHN's assessment in 2010 found that A.A.A. was very resistant to bathing and grooming and would bite and fight against washing, shampooing, and tooth brushing. The PHN noted that A.A.A.'s mother was also required to feed him between the laps he ran around the room. For these reasons, the PHN determined that A.A.A. has dependencies in dressing, grooming, eating, and bathing. It is not that A.A.A. cannot physically move his hands to feed himself, or dress himself, or clean himself that causes him to be dependent—it is his behavioral condition that creates both the physical dependence as well as the Level I behaviors.

Under the plain language of Minn.Stat. §§ 256B.0652 and 256B.0659, ADLs and Level I behaviors are separate concepts, and the two concepts not only may, but must be added together when determining the amount of authorized PCA services to award a disabled individual. Any other interpretation is contrary to the plain language of the statute. Minnesota Statutes § 256B.0652, subd. 6(b), provides that the PCA assessment shall be determined by (1) the total number of dependencies in ADLs; (2) the number of complex health-related needs, *and* (3) the presence of

Level I behaviors. The Legislature's use of the conjunctive "and" means that PCA time is *added* for each critical ADL, complex health-related function, and Level I behavior. This interpretation should be obvious given the statutory mandate that when construing statutes, "words and phrases are construed according to rules of grammar and according to their common and approved usage." Minn.Stat. § 645.08(1) (2012). The three categories must be separately considered and added. The statute does not limit the calculation of benefits when a condition falls into more than one of the three categories.

The Legislature could have made the language in section 256B.0652 disjunctive, but it did not. The Legislature could have provided that dependencies in ADLs should not be included when they are already accounted for in Level I behaviors, but it did not. Therefore, it follows that A.A.A. is entitled to receive an additional 30 minutes of PCA time based on his dependency in mobility, which is a critical ADL. This result is mandated by the statute even when A.A.A. is also allotted an extra 90 minutes of assistance due to his Level I behaviors.

I believe that the foregoing plain-meaning interpretation of the language in the statute at issue makes sense. It is one thing for an individual to need physical assistance moving from place to place—for example, in a wheelchair. But the required supervision is potentially more intense when the need is related to behavioral or cognitive issues. A.A.A. must be watched and his hand constantly held or he may run away with potential devastating results.

Having concluded that A.A.A. has a sixth ADL dependency related to mobility, it is also necessary to conclude that he has an additional complex health-related function due to his mobility dependence. Minnesota Statutes § 256B.0652, subd. 6(c)(2), provides that 30 additional minutes is to be added to the base allotment of PCA time for each complex health-related need. There are eight types of complex health-related needs identified in Minn. Stat. § 256B.0659, subd. 4(c), including subdivision 4(c)(8), which encompasses: "other congenital or acquired diseases creating a need for significantly increased direct hands-on assistance and interventions in six to eight activities of daily living." A.A.A.'s March 2010 PCA Plan identified dependencies in five ADLs— dressing, grooming, bathing, eating, and toileting. The Commissioner found that A.A.A. is not dependent in mobility because his need for assistance is due to cognitive behaviors. But given that I conclude that the undisputed record establishes that A.A.A. has a dependency in mobility because of his autism, he needs direct hands-on intervention and assistance in six ADLs, not five. Therefore, A.A.A. is entitled to an additional 30 minutes of authorized PCA services as specified in Minn.Stat. §§ 256B.0659, subd. 4(c)(8), 256B.0652, subd. 6(c)(2).

For all the foregoing reasons, I would reverse the court of appeals and affirm the conclusions reached by both the Human Services judge and the Hennepin County District Court. I would remand to the district court so it can reinstate its order authorizing a total amount of 450 minutes of PCA services per day for A.A.A. As I mentioned earlier, I conclude that the Commissioner has lost sight of the forest because of a narrow focus on the trees. There has been too much parsing of the separate meaning of particular words, such that the plain meaning and overall concept of the statutory scheme has been lost. In the case before us, we must look at section 256B.0659 as a whole. When we do look at

the statute as whole, A.A.A. is entitled to the relief he seeks.

I recognize that this type of case can be very complex and difficult to resolve. These cases are made all the more difficult because of the often tragic circumstances and living conditions that are daily companions of the disabled individual and his and her family. Under such circumstances, an additional 60 minutes of care per day means a lot to A.A.A. and his family. If the law provides for the extra 60 minutes, he should get them. That said, I acknowledge that in Minnesota we do a better job than most in taking care of those with special needs. We have a right to be proud of that reputation. While I strongly believe that A.A.A. is entitled to the extra 60 minutes per day—whether he receives 390 or 450 minutes—I must acknowledge that Minnesota still does a good job in living up to the goal established by the late Vice President and United States Senator Hubert H. Humphrey who said, "[T]he moral test of government is how that government treats those who are in the dawn of life, the children; those who are in the twilight of life, the elderly; and those who are in the shadows of life—the sick, the needy, and the handicapped." [6]

I would reverse the court of appeals.

---

**6.** *Hubert H. Humphrey: Additional Info,* Encyclopedia Britannica, http://www.britannica.com/EBchecked/topic/276362/Hubert-H-Humphrey/276362suppinfo/Supplemental-Information (last visited May 15, 2013).