# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-1113

_____

Pitman Farms

*Plaintiff - Appellee*

v.

Kuehl Poultry, LLC; Rodney Boser; Dan Schlichting; John Tschida; Chris Uhlenkamp; David Welle

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 14, 2021
Filed: September 8, 2022

_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.

_____

SMITH, Chief Judge.

This case concerns the application of two Minnesota statutes and a rule promulgated by the Minnesota Department of Agriculture (MDA) that establish the liability of a parent company for the unmet contractual obligations of its subsidiary under certain kinds of agricultural contracts. Minn. Stat. § 17.93, subd. 2; Minn. Stat. § 27.133; Minn. R. 1572.0040. At issue is whether the relevant Minnesota statutory

and administrative law applies to chicken production contracts between the defendants (collectively, the Growers), who are Minnesota chicken producers, and Simply Essentials, LLC (Simply Essentials), a chicken processor. If they apply, then plaintiff Pitman Farms (Pitman Farms), a California corporation and Simply Essentials's parent company, is liable to the Growers for Simply Essentials's breaches of contract.

Pitman Farms brought suit under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that the Minnesota statutes and cases governing agricultural parent-company liability do not apply to the Growers' contracts with Simply Essentials. Pitman Farms argued that the parent-liability authorities do not by their own terms apply to the contracts. Pitman Farms also argued that Delaware law rather than Minnesota law governs the Growers' contracts with Simply Essentials. Lastly, it argued that applying the parent-liability authorities would run afoul of the federal dormant Commerce Clause doctrine.

The Growers filed a counterclaim also for declaratory relief. In it, they sought contrary declarations and damages. The parties filed cross-motions for summary judgment on their respective declaratory-judgment claims. The district court granted Pitman Farms's summary-judgment motion and denied the Growers' cross-motion based upon its conclusion that the Minnesota parent-liability authorities do not by their terms apply to the subject contracts because those authorities do not apply to parent companies of LLCs. It did not reach Pitman Farms's other arguments. We now reverse and remand for further proceedings.

## I. *Background*
### A. *The Legislation at Issue*

This dispute concerns two provisions of the Minnesota Statutes and a related administrative rule: (1) Minn. Stat. § 17.93, subd. 2 ("Parent company responsibility for contracts of subsidiaries"), (2) Minn. Stat. § 27.133 ("Parent company liability"),

and (3) Minn. R. 1572.0040 ("PARENT COMPANY LIABILITY"). These authorities establish liability of parent companies for the debts of their subsidiaries with respect to certain agricultural contracts, overriding the general rule that precludes such liability.

These authorities have a common origin. On April 28, 1988, the Minnesota Legislature directed the MDA commissioner to convene an advisory task force to advise and provide recommendations to the legislature for "economic protection for [Minnesota] farmers producing agricultural commodities under contract." *Pitman Farms v. Kuehl Poultry LLC*, 508 F. Supp. 3d 465, 485 n.16 (D. Minn. 2020) (quoting 1988 Minn. Laws 1265). "Such economic protection 'would be provided when businesses have filed bankruptcy and are unable to make payments under the contract or are otherwise financially unable to make payments under the contract.'" *Id*. (quoting 1988 Minn. Laws 1265). In February 1990, the advisory task force issued its Final Report. The Report reiterated the task force's purpose to study and recommend new programs that would provide economic protection for producers of agricultural products. *See* R. Doc. 70-8, at 9.

Two months later, the Minnesota Legislature enacted economic protections for Minnesota farmers based upon these recommendations. Those economic protections are found in two chapters of the Minnesota Statutes relating to agriculture: chapters 17 and 27.[1] With respect to chapter 17, these protections are found specifically in §§ 17.90–.98.[2]

---

[1]The relevant chapter 27 provisions include §§ 27.03, subds. 3–4; 27.04; 27.0405; 27.041; 27.06; 27.131; 27.133 (at issue here); and 27.138.

[2]"Agricultural Contracts" is the heading that introduces sections 17.90 to 17.98 of the Minnesota Statutes.

Section 17.93 provides, in relevant part:

> Parent company liability. If an agricultural contractor is the subsidiary of another corporation, partnership, or association, the parent corporation, partnership, or association is liable to a seller for the amount of any unpaid claim or contract performance claim if the contractor fails to pay or perform according to the terms of the contract.

Minn. Stat. § 17.93, subd. 2 (emphasis omitted).

Chapter 17 of the Minnesota Statutes contains provisions generally relating to the purpose and operations of the MDA. *Id.* ("Chapter 17. Department of Agriculture"). This includes provisions establishing the department and its principal positions, such as the position of commissioner, *see id.* § 17.01, as well as prescribing the powers and duties of the department, *see, e.g.*, *id.* §§ 17.013, 17.03, 17.039–.107. Many sections of chapter 17 authorize the MDA commissioner to promulgate administrative rules to enforce or to implement different sections of this chapter. *See, e.g.*, *id.* §§ 17.035, subd. 2(a); 17.494; 17.496–.498; 17.4997; 17.701; 17.991. Section 17.945 authorizes the MDA commissioner to "adopt rules to implement sections 17.90 to 17.98." Under this authority, the MDA commissioner sought to implement chapter 1572 of the Minnesota Rules.

Pursuant to Minn. Stat. § 14.131, the MDA prepared a "statement of need and reasonableness" (SONAR)[3] in reference to chapter 1572. The SONAR for the

---

[3]Section 14.131 requires Minnesota state administrative agencies to prepare a SONAR and make it available for public review prior to the adoption of a rule. The SONAR sets forth the rationale for the rule and includes such information as a "description of the classes of persons who probably will be affected by the proposed rule," likely costs of rule enforcement, and "a determination of whether there are less costly methods or less intrusive methods," among other matters, that went into the proposal, consideration, and ultimate decision to adopt a new rule. *Id.*

adoption of a proposed "Rule Governing Producer Protection" was published on November 19, 1990. R. Doc. 70-9, at 1 (emphasis omitted). The SONAR referred repeatedly to Minn. Stat. §§ 17.90–.98 as the "Producer Protection Act," and it identified the overarching purpose for the adoption of rules "governing the protection of producers . . . to implement the Producer Protection Act[,] including the prohibition of specific trade practices." *Id.*

Minnesota Rule 1572.0040 implements § 17.93, and it contains similar language to its companion statutory provision:

> A corporation, partnership, sole proprietorship, or association that through ownership of capital stock, cumulative voting rights, voting trust agreements, or any other plan, agreement, or device, owns more than 50 percent of the common or preferred stock entitled to vote for directors of a subsidiary corporation or provides more than 50 percent of the management or control of a subsidiary is liable to a seller of agricultural commodities for any unpaid claim or contract performance claim of that subsidiary.

With regard to Rule 1572.0040, the SONAR explained that "[t]his rule is reasonable because it allows the producer recourse against a third party who substantially owns or controls the corporation that has contracted with the producer." R. Doc. 70-9, at 3. Additionally, in its discussion of the potential effects of the MDA's implementation of the Act on small businesses, the SONAR reiterated that "[t]he intent of the Producer Protection Act was to provide financial protection for producers, most of whom are small business persons." *Id.* at 4. Chapter 1572, including Rule 1572.0040, went into effect in March of 1991. 15 Minn. Reg. 1285, 1924 (Mar. 4, 1991).

Section 27.133 of the Minnesota Statutes provides as follows:

27.133 Parent company liability

If a wholesale produce dealer is a subsidiary of another corporation, partnership, or association, the parent corporation, partnership, or association is liable to a seller for the amount of any unpaid claim or contract performance claim if the wholesale produce dealer fails to pay or perform according to the terms of the contract and this chapter.[4]

In a provision entitled "Public policy," chapter 27 provides a statement of the legislature's policy goal in enacting the statute: "It is therefore declared to be the policy of the legislature that certain financial protection be afforded those who are producers on the farm . . . ." *Id.* § 27.001.

It is undisputed that Simply Essentials was the subsidiary of its parent, Pitman Farms, which had a greater than 50-percent stake in the former. It is likewise undisputed that the Growers are "producers" for the purpose of § 17.93 as that term is defined in § 17.90:

---

[4]After this suit commenced, the Minnesota legislature amended chapter 27 to substitute "wholesale produce dealer" with the newly defined term "farm products dealer." *See* 2020 Minn. Sess. Law Serv. Ch. 89 (H.F. 4285), art. 1 § 14. The amendments were approved by the Governor on May 16, 2020, and took effect on August 1, 2020. *See* Minn. Stat. § 645.02. While the parties do not address this issue, we note that the prior version of chapter 27 governs this dispute because, under Minnesota law, statutes do not apply retroactively "unless clearly and manifestly so intended by the legislature," Minn. Stat. § 645.21, and there is no apparent indication of such an intent, *cf. Lieser v. Sexton*, 441 N.W.2d 805, 807 (Minn. 1989) (finding clear and manifest intent of the legislature to apply a statute retroactively where the statute included "an immediate effective date" and "appl[ied]. . . to 'all cases pending'"). Because the prior version of chapter 27 was in effect when this dispute arose, it is the version that is cited herein.

"Producer" means a person who produces or causes to be produced an agricultural commodity in a quantity beyond the person's own family use and:

(1) is able to transfer title to another; or

(2) provides management, labor, machinery, facilities, or any other production input for the production of an agricultural commodity.

*Id.* § 17.90, subd. 4. The Growers "provide[d] management, labor, machinery, [and] facilities" for producing chickens, but they did not own the chickens and could not therefore transfer title to any commodity. *Id.* Hence, they meet the definition of "producer" given in subparagraph (2) but not that given in subparagraph (1).

The term "producer" appears repeatedly in the sections from 17.90 to 17.98.[5] "Seller," on the other hand, only appears twice: once in § 17.90 and again in § 17.93. As to the former instance, the term appears within the definition of "[a]gricultural contract" and is used to specifically exclude contracts with "seller[s] of grain" from the definition. *Id.* § 17.90, subd. 1a. "Seller" is not defined in § 17.90.

However, "seller" is defined in chapter 27: "'Seller' means a farmer or wholesale produce dealer, whether the person is the owner of the produce or produces it for another person who holds title to it." *Id.* § 27.01, subd. 10. It is undisputed that the Growers are "sellers" for the purpose of chapter 27 again based upon the fact that the Growers "produce[d] [chickens] for another person [(Simply Essentials)] who h[eld] title to [them]." *Id.*

Another difference between chapters 17 and 27 is that the former imposes parent liability when the subsidiary is an "agricultural contractor" while the latter

---

[5]*Id.* §§ 17.91, 17.92, 17.941, 17.942, 17.943, 17.944, 17.9441, 17.97, 17.98.

imposes the same when the subsidiary is a "wholesale produce dealer." Section 17.90 defines "[c]ontractor" to be "a person who in the ordinary course of business buys agricultural commodities grown or raised in this state or who contracts with a producer to grow or raise agricultural commodities in this state." *Id.* § 17.90, subd. 3.[6] "Agricultural contractor" is left undefined in chapter 17.

Chapter 27 defines "[w]holesale produce dealer" to be "a person who buys from or contracts with a seller for production or sale of produce in wholesale lots for resale." *Id.* § 27.01, subd. 8(1).[7]

Thus, both "contractor" and "wholesale produce dealer" are defined as "persons." Section 645.44 defines this term: "'Person' may extend and be applied to bodies politic and corporate, and to partnerships and other unincorporated associations." *Id.* § 645.44, subd. 7. This definition of "person" applies as the term is "used in Minnesota Statutes or any legislative act . . . unless another intention clearly appears." *Id.*, subd. 1.

Minnesota's Limited Liability Company Act, which established the limited liability company (LLC) as a legal entity, was first enacted in 1992 as chapter 322B. *See* 1992 Minn. Laws ch. 517 (H.F. No. 1910).[8] This came two years after the

---

[6]Minn. Stat. § 17.90, subd. 2 defines "[a]gricultural commodity" to "include[] . . . poultry." It is undisputed that the chickens that the Growers produced were agricultural commodities under the statute.

[7]Minn. Stat. § 27.01, subd. 2(3) defines "[p]roduce" to include "poultry and poultry products." It is undisputed that the chickens that the Growers produced were produce under the statute.

[8]In 2014, the Minnesota Revised Uniform Limited Liability Company Act was enacted and codified in Chapter 322C, and Chapter 322B was repealed. *See* 2014 Minn. Laws ch. 157 (H.F. No. 977).

legislature's enactment of §§ 17.90–.98 and the amendments to chapter 27 and one year after chapter 1572 became effective. The Act included provisions directing that many other statutes be amended to include explicit references to limited liability companies. 1992 Minn. Laws ch. 517 (H.F. No. 1910), art. 1. However, it did not direct that any agricultural statutes be amended.

## B. *The Dispute*

In 2017, the Growers each entered into separate agreements with Prairie's Best Farm, Inc. (Prairie's Best), a Minnesota chicken processor, to grow chickens in exchange for monthly payments and bi-monthly bonus payments. On November 10, 2017, Simply Essentials purchased the assets of Prairie's Best and assumed the production agreements. Simply Essentials was a limited liability company organized under Delaware law and headquartered in California.

Three days later, Pitman Farms purchased Simply Essentials's membership interests and became its only member. In 2019, Simply Essentials ceased operating due to financial difficulties. On June 7, 2019, Simply Essentials notified the Growers that it was winding down its business operations and liquidating its assets and that it would terminate its contracts with the Growers effective September 5, 2019. Following the termination of their contracts, the Growers made multiple demands for payment on Pitman Farms for Simply Essentials's debts. The Growers alleged that they were owed over $6 million due to breaches by Simply Essentials. The Growers believed Pitman Farms, as corporate parent for Simply Essentials, was liable based upon Minnesota agricultural parent-company-liability law. Pitman Farms, however, disputed the Growers' contention that it was responsible for Simply Essentials's contractual obligations and denied that the parent-company-liability authorities applied.

In response to the Growers' claims, Pitman Farms filed this declaratory judgment action under the federal Declaratory Judgment Act, 28 U.S.C. § 2201,

seeking a declaration that the parent-company-liability statutes and rule do not govern the Growers' contracts with Simply Essentials. Pitman Farms argued that these authorities do not apply by their own terms to the contracts because (1) § 17.93, subd. 2, and Rule 1572.0040 only provide statutory relief to "sellers," and the Growers were not "sellers" for the purposes of this provision; and (2) despite being "sellers" for the purposes of the § 27.133, they were not entitled relief because Simply Essentials, an LLC, was not a "corporation, partnership, or association" under any of the parent-company-liability authorities. Pitman Farms further argued that § 322C.0801 of the Minnesota Uniform LLC Act mandates application of Delaware law and forecloses any application of parent-company-liability under Minnesota law. Pitman Farms asserted that since Delaware law applies, applying parent-company liability under Minnesota law would violate the federal Dormant Commerce Clause doctrine. The Growers brought a counterclaim also under the Declaratory Judgment Act, making essentially opposite arguments.

The district court granted Pitman Farms's motion for summary judgment and denied the Growers' cross-motion, on the grounds that the parent-company-liability authorities by their own terms do not govern the subject contracts. The court reasoned that § 17.93 only provides relief to "sellers," not "producers," and that the Growers, being the latter, were without remedy. The court further reasoned that none of the relevant statutes or cases apply when, as here, the subsidiary is a limited liability company. Because the court held that the statutes by their own terms do not apply, it did not consider the remaining choice-of-law and Dormant Commerce Clause issues.

## II. *Discussion*

On appeal, the Growers argue that the district court erred in holding that they were not entitled to seek relief against Pitman Farms for its subsidiary Simply Essentials's unmet obligations under the Minnesota parent-company-liability laws. Pitman Farms, for its part, argues the same issues that it raised before the district court.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Cross-motions for summary judgment require viewing the evidence in the light most favorable to the plaintiff and defendant in turn, depending on whose motion is being considered. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

Substantive issues in a diversity case under 28 U.S.C. § 1332, as here, are governed by state law. *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This case turns on the interpretation of Minnesota law. Statutory interpretation is substantive rather than procedural because it concerns the meaning and application of state substantive law. *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015) ("Interpreting state statutes, this court applies that state's rules of statutory construction"). Accordingly, we will follow Minnesota law in interpreting its statutes and regulations. In Minnesota, "[a]dministrative rules have the force and effect of law." *Minn. Energy Res. Corp. v. Comm'r of Revenue*, 886 N.W.2d 786, 801 (Minn. 2016) (citing Minn. Stat. § 270C.06 ("Rulemaking authority"); *U.S. W. Material Res., Inc. v. Comm'r of Revenue*, 511 N.W.2d 17, 20 n.2 (Minn. 1994)). Like its statutes, Minnesota's administrative rules are subject to the Minnesota Legislature's rules of statutory construction. Minn. Stat. § 645.001. Under Minnesota law, "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." *Id.* § 645.16 ("Legislative intent controls"). Moreover, the legislature has provided a number of places to look to ascertain that intent. *See id.* § 645.16 (1)–(8); *see also Christianson v. Henke*, 831 N.W.2d 532, 537 (Minn. 2013).

This case presents three distinct interpretive questions that we will consider in turn.

## A. *The Meaning of "Seller"*

The first question is whether the Growers are "sellers" under § 17.93 and the administrative rule implementing it, Rule 1572.0040. The district court held that, despite their undisputedly being "sellers" for the purpose of § 27.133, the Growers were not "sellers" under § 17.93 or Rule 1572.0040, leaving them without relief under those provisions.

Since "seller" is not defined in the statute, the court looked to chapter 17's definition provision (§ 17.90) and parent-company-liability provision (§ 17.93) along with Rule 1572.0040 to determine what the legislature intended the term to mean. The court began with the definition of "producer" in § 17.90, subdiv. 4, which distinguishes between two kinds of producers: the first, one who produces an agricultural commodity and can transfer title to it (that is, who owns the commodity and can sell it); the second, one who merely provides a service or input to produce the commodity and presumably does not own the commodity. There is no dispute that the Growers meet the second part of the definition. But, as they did not own the chickens that they produced, they could not transfer title and thus failed to meet the first part of the definition.

The court, endeavoring to avoid surplusage and to give effect to every word of the statute, reasoned that "seller" in § 17.93 must be contrasted with "producer" as defined in § 17.90. In making this distinction, the court limited the possible meanings of "seller" in the statute. However, it still had to define the term. Accordingly, the court turned its attention to Rule 1572.0040, which implemented § 17.93, to help uncover the legislature's intended definition of "seller." It determined that the term was used to "limit[] parent-company liability to contracts between a subsidiary and 'a seller of agricultural commodities.'" *Pitman Farms*, 508 F. Supp. 3d at 477

-12-

(quoting Minn. R. 1572.0040). Based on the use of the phrase "seller *of agricultural commodities*," the court inferred that the rule's definition was "narrower than the definition of 'producer' for purposes of sections 17.90 to 17.98 because it includes only the transfer-of-title element of that definition from section 17.90, subdivision 4(1) and omits the provision-of-services element described in section 17.90, subdivision 4(2)." *Id.* (emphasis added). And because the Growers never owned the chickens that they produced and were thus unable to transfer title to them, the court reasoned that "[i]n view of the heightened deference owed Rule 1572.0040 and the good reasons for interpreting section 17.93 to share the rule's reach, neither section 17.93 nor the rule govern the Growers' contracts with Simply Essentials." *Id.* at 478.

The court's reasoning rests upon two canons of construction found in Minnesota law: (1) the rule against surplusage and (2) the presumption of consistent usage. "The canon against surplusage 'favors giving each word or phrase in a statute a distinct, not an identical, meaning.'" *State v. Thompson*, 950 N.W.2d 65, 69 (Minn. 2020) (quoting *State v. Thonesavanh*, 904 N.W.2d 432, 437 (Minn. 2017)).[9] "'[W]hen different words are used in the same context, we assume that the words have different meanings' so that every word is given effect." *Id.* (quoting *Dereje v. State*, 837 N.W.2d 714, 720 (Minn. 2013)). "Stated differently, we attempt to avoid interpretations that would render a word or phrase superfluous, void, or insignificant, thereby ensuring each word in a statute is given effect." *Id.* Additionally, Minnesota courts have adopted the presumption of consistency in diction, such that a word used in similar contexts throughout a statute should hold fast to its meaning while another word appearing in its stead should be given another meaning. *Id.* These presumptions are in keeping with United States Supreme Court precedent, which recognizes "the

---

[9]Notably, in *Thompson*, the Minnesota Supreme Court rejected an argument that "false" and "fictitious" should be distinguished within a statute, observing that the canons against surplusage and in favor of consistent usage were "not helpful here." *Id.*

usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (internal quotation marks omitted).

But when the statute is part of a broader statutory scheme, another canon of interpretation, *in pari materia*, should also be considered. Certain canons, like the rules against surplusage and inconsistent usage, become more useful as the appropriate frame of reference narrows, as when interpreting a single term as used within a single statute. The *in pari materia* canon, on the other hand, can be more useful when multiple statutes are at issue:

> Statutes relating to the same subject matter, especially where they have the same purpose in view, are *[i]n pari materia* and are to be construed together the same as if they constituted but one statute. The object of the rule is to ascertain and carry into effect the intention of the legislature, and it proceeds upon the supposition that the several statutes were governed by one spirit and policy and consequently were intended to be consistent and harmonious in their several parts and provisions.

*McNeice v. City of Minneapolis*, 84 N.W.2d 232, 236 (Minn. 1957) (emphasis added) (cleaned up); *see also Cent. Hous. Assocs., LP v. Olson*, 929 N.W.2d 398, 406 (Minn. 2019) ("Generally, statutes relating to the same subject matter or with a common purpose 'should be construed together.'" (quoting *Apple Valley Red-E-Mix, Inc. v. Minn. Dep't of Pub. Safety*, 352 N.W.2d 402, 404 (Minn. 1984)); *Harris v. Cty. of Hennepin*, 679 N.W.2d 728, 732 (Minn. 2004) (it is a well-established rule of statutory construction that "[s]tatutes should be read as a whole with other statutes that address the same subject"); *Hahn v. City of Ortonville*, 57 N.W.2d 254, 261 (Minn. 1953) ("When legislative acts involve a single subject or problem, there is an unusually strong reason for applying the rule of statutory construction that when

statutes are *[i]n pari materia* they are to be construed harmoniously and together." (emphasis added)).

The United States Supreme Court has acknowledged that it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks omitted). Furthermore, the Court has specifically noted that "the presumption of consistent usage 'readily yields' to context, and a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air Regul. Grp. v. EPA.*, 573 U.S. 302, 320 (2014) (quoting *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)). The simultaneous enactment of a set of statutes addressing the same problem can be additional evidence of a single statutory scheme. *Cf. Hahn*, 57 N.W.2d at 261 (finding three statutes "supplementary to one another and . . . integral parts of a unified plan" despite being "enacted at different times").

The Minnesota general parent-company-liability statute (§ 27.133), the Producer Protection Act (§§ 17.90–.98), and the implementation rule for that Act were all passed in the same legislative session, address the same issue, and have nearly identical language. Thus, viewing these provisions *in pari materia* makes sense. Accordingly, the district court should have considered § 27.133 in construing the meaning of "seller" in § 17.93 and in Rule 1572.0040.

Considering these provisions together, we hold that the term "seller" can include "producer" when applying the Producer Protection Act and its implementing Rule.

-15-

The term "seller" is ambiguous as it is used in § 17.93 and in Rule 1572.0040. First, it is left undefined. Second, there are at least two reasonable interpretations for the meaning of the term. *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290 (Minn. 2013) ("A statute is ambiguous only if it is susceptible to more than one reasonable interpretation."); *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 72–73 (Minn. 2012). One meaning, for which Pitman Farms argues and which the district court accepted, flows from the canons against surplusage and inconsistent meanings and distinguishes "seller" from the defined term "producer." Accordingly, it limits the definition of "seller" to transferors-of-title. A second meaning, sought by the Growers, ascribes to § 17.93 and Rule 1572.0040 the definition of "seller" given in chapter 27. The latter interpretation would enable the Growers to be "sellers" for the purposes of all three relevant authorities.

Minnesota law discerns legislative intent by taking a number of nonexclusive considerations into account, including:

(1) the occasion and necessity for the law;

(2) the circumstances under which it was enacted;

(3) the mischief to be remedied;

(4) the object to be attained;

(5) the former law, if any, including other laws upon the same or similar subjects;

(6) the consequences of a particular interpretation;

(7) the contemporaneous legislative history; and

(8) legislative and administrative interpretations of the statute.

Minn. Stat. § 645.16. Section 27.001 provides a clear statement of the legislature's policy goals[10] in its section entitled "Public policy": "It is therefore declared to be the policy of the legislature that certain financial protection be afforded those who are *producers* on the farm." *Id.* (emphasis added). Unfortunately, chapter 27 does not actually define or use the term "producer"; rather, it simply confers financial protections on "sellers." *See generally* Minn. Stat. ch. 27. "Seller" is defined in § 27.01, subdiv. 10, as "a farmer or wholesale produce dealer, whether the person is the owner of the produce or *produces* it for another person who holds title to it." *Id.* (emphasis added). Based on this definition and on the stated legislative purpose, it is reasonable to conclude that chapter 27 considers "seller" and "producer" to be functionally equivalent terms for its purposes of protecting agricultural producers.

Furthermore, as this definition encompasses both the provision of production services and the ability to transfer title of farm products, it is the functional equivalent of chapter 17's definition of "producer." *Cf. id.* § 17.90, subd. 4 (defining "producer" as one "who produces . . . an agricultural commodity" and can "transfer title to another" or "provides . . . production input for the production of an agricultural commodity"). "Seller" and "producer" then have the same meaning (1) within chapter 27 and (2) across chapters 17 and 27. It is thus apparent that the legislature in building this statutory scheme considered "seller" and "producer" to be synonymous for at least some purposes.[11]

---

[10]This purpose is likewise clear from the statutes' legislative history. *See* 1988 Minn. Laws ch. 688 (H. F. No. 1000) art. 13, § 1 (setting forth the legislative purpose "to provide economic protection for farmers producing agricultural commodities under contract").

[11]This interpretation may create surplusage. However, it would by no means be the only place in this statute where surplusage appears. To take one such example, § 17.93, subd. 2, imposes liability upon parent companies whose subsidiary is "an agricultural contractor." "Agricultural contract" is defined as "any written contract

-17-

The district court considered Rule 1572.0040's use of the term "seller" in relation to agricultural commodities to limit it to transferors-of-title. We disagree. The court's construction is at odds with the intentions of the drafters. The MDA consistently reasserted that the purpose of the Rule was to provide financial protections to producers not merely commodity sellers. *Cf. Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009) ("[I]f the relevant text is not reasonably susceptible to more than one interpretation, we will not look beyond it unless application of the plain language 'will produce a result demonstrably at odds with the intentions of its drafters.'" (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989)), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018). The rule must be read in its context, that is, against the statutory background that it is enacting. *See, e.g.*, *Brown & Williamson*, 529 U.S. at 133.

Even assuming *arguendo* that the MDA indeed meant to interpret "seller" as only involving transfer of title, this interpretation does not meet our standards for deference. In this case, the interpretation would not be "reasonable," *see A.A.A. v. Minn. Dep't of Human Servs.*, 832 N.W.2d 816, 822–23 (Minn. 2013), and moreover there are "compelling indications that it is wrong," *Buhs v. State, Dep't of Pub. Welfare*, 306 N.W.2d 127, 129 (Minn. 1981) (internal quotation marks omitted). As discussed above, the reasonableness of the interpretation of this rule must be evaluated against the backdrop of the statutory scheme that gave rise to the rule. To adopt a reading of "seller" that brings it into conflict with chapter 27 produces a result greatly at odds with the express legislative intent. *See* Minn. Stat. § 645.17 (stating

---

between a contractor and a producer," and "[c]ontractor" is defined as one "buy[ing] agricultural commodities" or "contract[ing . . . to grow or raise agricultural commodities," but "agricultural contractor" is undefined. *Id.* § 17.90, subd. 1a, 3. Thus, as the only contractors relevant to the statute deal in agriculture, qualifying "contractor" with "agricultural" adds nothing—it is simply redundant.

-18-

that courts may presume that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable"). Such a reading defines certain producers as "sellers" for the purpose of one parent-company-liability statute but specifically excludes them from that definition for another virtually identical statute. Assuming all other necessary conditions were met, this would mean that non-seller producers may seek relief under § 27.133 but are singled out to be denied identical relief under § 17.93 and Rule 1572.0040. We do not believe this was the intent of the legislature.

The Minnesota parent-company-liability authorities are *in pari materia*. Reading § 17.93 and Rule 1572.0040 in light of chapter 27 requires reading the term "seller" to include "producer" in the Producer Protection Act. As the Growers are undisputedly sellers for the purpose of § 27.133, they should accordingly be considered sellers for the purpose of § 17.93 and Rule 1572.0040. For these reasons, the district court erred in holding that the Growers were not "sellers" under § 17.93 and Rule 1572.0040.

### B. *The Meaning of "Another"*

Sections 17.93 and 27.133 apply, and trigger parent-company liability, when the company in default is a "subsidiary of another corporation, partnership, or association." Minn. Stat. §§ 17.93, subd. 2; 27.133. Pitman Farms contends that the use of "another" in this context requires both the parent and the subsidiary to be a corporation, partnership, or association. The Growers argued before the district court and argue now on appeal that the use of "another" here simply distinguishes one organization, the subsidiary, from a different one, the parent.

The district court agreed with Pitman Farms. The court observed that "Minnesota courts 'construe the word "another" according to its common and approved usage unless it is defined in statute or has acquired a special meaning.'" *Pitman Farms*, 508 F. Supp. 3d at 478 (quoting *State v. Stewart*, 624 N.W.2d 585,

589 (Minn. 2001)). The district court made note of two cases where Minnesota courts rejected arguments similar to the Growers'. In *Elsola v. Commissioner of Revenue*, the Minnesota Tax Court rejected an argument that "another state" referred to a foreign country in a statute that imposing liability upon a "resident of this state" to pay "to another state or a province or territory of Canada," holding instead that "another state" meant "one of the states of the United States other than Minnesota." No. 3980, 1984 WL 2983, at *1–2 (Minn. Tax Ct. Apr. 9, 1984) (emphasis omitted). And in *State v. Campbell*, the Minnesota Supreme Court held that "another offense" applied only to felonies, not to misdemeanors, reasoning that it appeared in the Minnesota Sentencing Guidelines which in general only apply to felonies. 814 N.W.2d 1, 5 (Minn. 2012). These cases stand for the proposition that to uncover the meaning of "another," we look to the semantic and statutory context in which it appears.

The district court also observed that the Growers' interpretation would effectively read the word "another" out of the statutes because a subsidiary and a parent are by definition distinct entities. Thus, their interpretation lacks semantic and legal support and also creates surplusage. *See, e.g.*, *Thompson*, 950 N.W.2d at 69 ("[W]e attempt to avoid interpretations that would render a word or phrase superfluous, void, or insignificant, thereby ensuring each word in a statute is given effect.").

The court explained that the ambiguity underlying this dispute "arises because the definition of 'another' has at least two components in tension with each other"—namely, that "another" implies both sameness and distinctiveness. *Pitman Farms*, 508 F. Supp. 3d at 479. In short, the word refers to a *different* member of the *same* group or kind. Thus, "another corporation, partnership, or association" means a *second* member of the group composed of "corporations, partnerships, and associations" that is distinct from a *first* member of the same group. In other words,

-20-

the subsidiary—as well as the parent—has to be a "corporation, partnership, or association" according to what those words refer to under the statutes.

The district court is right. The Growers' interpretation fails to do justice to the statutes' plain language. The meaning of the word "another," if left undefined by statute, is constrained by its immediate semantic context. *See Stewart*, 624 N.W.2d at 589; *Campbell*, 814 N.W.2d at 5; *Elsola*, 1984 WL 2983, at *1. The district court correctly held that "'another' is better understood [as indicating] that both the parent and subsidiary must be drawn from one of the categories listed in section 27.133 [and section 17.93]." *Pitman Farms*, 508 F. Supp. 3d at 480.

C. *The Meaning of "Corporation, Partnership, or Association"*

The district court's interpretation of the three parent-company-liability authorities construed the phrase "corporation, partnership, or association" as excluding LLCs.[12] Consequently, because Simply Essentials was an LLC, its parent, Pitman Farms, was not liable for Simply Essentials's debts. In so holding, the court rejected the Growers' argument, renewed on appeal, that the legislature used this phrase to enact parent-company liability for subsidiaries of any business form, including LLCs. Calling the question "close and difficult," the court identified "[f]our primary considerations [that] le[d] to this conclusion":

> first, that section 27.133 was enacted before the creation of limited liability companies in Minnesota but has not been amended since; second, that "association" does not seem intended in section 27.133 as

---

[12]While the district court only analyzed this question with respect to § 27.133, it noted that its analysis would apply to § 17.93 as well if the Growers were in fact "sellers" under the latter provision. Rule 1572.0040 has comparable though slightly different language in that it adds "sole proprietorship" to the above list. We do not think that this addition materially affects the analysis, and what follows applies to all three Minnesota parent-company-liability authorities.

a catch-all for every form of business organization that might exist; third, that "association" is more commonly intended to mean something different from a limited liability company when it is used elsewhere in Minnesota statutes; and fourth, that no Minnesota case answers the question.

*Pitman Farms*, 508 F. Supp. 3d at 480. The court observed that while "this conclusion appears somewhat at odds with section 27.133's general purpose, . . . that general purpose cannot be understood without accounting for textual limits." *Id*.

Minnesota case law nearest to the point is inconclusive. Before the district court, Pitman Farms relied on the case *Minnesota Joint Underwriting Ass'n v. Star Tribune Media Co.*, 862 N.W.2d 62 (Minn. 2015), for the proposition that an LLC could not be an association. It cited that case's statement that "an 'association' is not a legal entity separate from the persons who compose it." *Id.* at 66. The district court found this statement unhelpful in apprehending the meaning of the word in the relevant statutes because of the facts and matter at issue in that case. We agree with the district court.

The court also considered two cases much closer in application to the present issue. These cases specifically address whether an LLC can be treated as a corporation, partnership, or association for a particular statutory purpose. The first case—which the district court described as "[t]he case that comes the closest [to providing an answer] is *Enbridge Energy, Ltd. Partnership v. Dyrdal*, No. A08-1863, 2009 WL 2226488 (Minn. Ct. App. July 28, 2009)." *Pitman Farms*, 508 F. Supp. 3d at 483. As an unpublished opinion of the Minnesota Court of Appeals, it lacks precedential value, but its reasoning is helpful. In *Enbridge*, the court reasoned that the meaning of the undefined term "association" in an oil transportation statute must include LLCs because to hold otherwise would be absurd:

"Association" is left undefined by chapter 117; however, given the context in which association is used in chapter 117, it would be

absurd for us to conclude that the legislature intended to exclude certain types of business entities from the powers granted by Minn.[ ]Stat. § 117.48. *See* Minn.[ ]Stat. § 645.17 (2008) (stating that courts presume that the legislature does not intend results that are "absurd, impossible of execution, or unreasonable").

. . .

[Minn. Stat. § 117.48] addresses businesses that are in the business of transporting crude petroleum. *There is no indication from the text of the statute that the legislature intended to differentiate or exclude businesses that transport crude petroleum based on how they are organized or incorporated. To draw distinctions based on what type of form a business adopts would unnecessarily exclude businesses that would otherwise be eligible* to take property in furtherance of a public necessity or use.

*Enbridge*, 2009 WL 2226488, at *3 (emphasis added). The district court sought to distinguish this case, noting that "*Enbridge* does not warrant the same result here" because "[t]he context is quite different" and "the interpretive challenges raised . . . here . . . were not addressed in *Enbridge*." *Pitman Farms*, 508 F. Supp. 3d at 484. With regard to the difference in context, the court observed that "*Enbridge* concerned a challenge to a crude oil transporter's ability to acquire a right-of-way easement necessary to installation of a 108-mile underground pipeline." *Id*.

The reasoning of *Enbridge*, however, should not be overly discounted. The statute in question there conferred certain rights on business organizations. In *Enbridge*, as here, the dispute concerned a statute that conferred certain rights on businesses. Both statutes mention "associations" without defining the term and fail to mention "LLCs" at all. *Compare* Minn. Stat. § 117.48, *with id.* § 27.133. In *Enbridge*, as here, the basic interpretive challenge is whether an LLC is an "association" for purposes of entitlement to access to statutory remedies. While *Enbridge* concerned oil transportation and this case agricultural contracts, the statutory interpretation issue that formed the basis for the dispute is the same. In other

-23-

words, the two cases are comparable precisely on the most important point: would Minnesota exclude a class of businesses from the operation of a remedial statute on the basis of their business form?

Furthermore, the *Enbridge* court did not limit its interpretive conclusion to a particular statutory or industrial context; indeed, it said nothing about the specific context playing a role in its reasoning. Rather, the *Enbridge* court's reasoning relied upon a legal principle, the absurdity canon, found in Minn. Stat. § 645.17, which says that courts should read statutes to avoid "absurd . . . or unreasonable" results. Here, as in *Enbridge*, the statutory texts do not reflect a legislative intent "to differentiate or exclude businesses . . . based on how they are organized." 2009 WL 2226488, at *3.

The second case raised by the Growers that the district court distinguished is *Krueger v. Zeman Construction Co.*, 781 N.W.2d 858 (Minn. 2010). *Krueger* treated an LLC as a "person" for determination of the applicability of the Minnesota Human Rights Act, which defined "'person' [to] include[] a partnership, association, or corporation" as well as other non-business entities. *Id.* at 862. The district court discounted its holding for lack of reasoning or analysis.

The district court accurately described the *Krueger* court's dearth of detailed analysis of this question. Indeed, the *Krueger* court did not even say which of the three business types mentioned—partnership, association, or corporation—qualifies an LLC as a "person" under the statute. *See id.* Nonetheless, *Krueger* does provide a second instance where Minnesota courts considered an LLC to be a "partnership, association, or corporation." *Id. Enbridge* and *Krueger* are not controlling, but they do provide this court insight into the current state of Minnesota law on the crucial question of whether LLCs can escape the operation of parent-company liability on the basis of the failure to list LLCs as a distinct business organization in the relevant statutes and Rule.

The Minnesota legislature's lack of amendment subsequent to the advent of LLCs played a significant role in the district court's conclusion. Upon our review, we do not think that this fact suffices to exclude LLCs from the operation of the laws at issue in this case.

Here, the *Enbridge* and *Krueger* cases provide some weight to tip the scale towards including LLCs as an association for purposes of the parent-company-liability provisions of the Producer Protection Act. Moreover, as the Growers argue, the Minnesota Statutes' generally applicable definition of "[p]erson" provides some additional weight. Minn. Stat. § 645.44, subd. 7. Both "contractor" in § 17.93 and "wholesale produce dealer" in § 27.133 are defined as "persons." "Person," in turn, is defined by Minn. Stat. § 645.44, subd. 7, as "extend[ing] and . . . appl[ying] to bodies politic and corporate, and to partnerships and other unincorporated associations."[13] This definition of "person" applies as the term is "used in Minnesota Statutes or any legislative act . . . unless another intention clearly appears." *Id.* § 645.44, subd. 1. The phrase "unincorporated associations" in the generally applicable definition of "person" is being used as a catch-all for businesses of any type. *See id.* § 645.44, subd. 7. An LLC is neither a corporate body nor a partnership; hence, if it is a legal person under Minnesota law, then it could only be such as an "unincorporated association."

Additionally, Minnesota law requires that ambiguity in statutory language be resolved with the intent of the drafters in mind. *Id.* § 645.16(4). *Enbridge* and *Krueger* also show that construing the Minnesota parent liability authorities to apply to LLCs constitutes a "reasonable interpretation"; assuming that reading it to exclude

---

[13]Additionally, some courts have interpreted the term "unincorporated associations" to include LLCs. *See, e.g.*, *Ferrell v. Express Check Advance of SC, LLC*, 591 F.3d 698, 705 (4th Cir. 2010) (holding that the phrase "unincorporated associations" includes LLCs); *Int'l Flavors & Textures, LLC v. Gardner*, 966 F. Supp. 552, 554–55 (W.D. Mich. 1997) (applying a rule that members determine citizenship of "unincorporated associations" to LLCs).

LLCs is also reasonable interpretation, this gives rise to ambiguity. *500, LLC*, 837 N.W.2d at 290 ("A statute is ambiguous only if it is susceptible to more than one reasonable interpretation."). Here, the legislative intent is clear: with respect to agricultural contracts, the Minnesota legislature intended parent companies to be liable for the breaches of their subsidiaries. *See* Minn. Stat. § 27.001. There is no apparent reason why the legislature would have decided to single out LLCs as exceptions. *Cf. Enbridge*, 2009 WL 2226488, at *3. Ambiguity occasioned by the absence of subsequent amendment should not wholly negate express, unambiguous statutory intent.

Lastly, we note chapter 27's "Public policy" section. In addition to providing the policy justification to protect agricultural producers, it also explains that "[t]he provisions of this chapter which relate to perishable agricultural commodities shall be liberally construed to achieve these ends and shall be administered and enforced with a view to carrying out the above declaration of policy." Minn. Stat. § 27.001. This comports with Minnesota Supreme Court precedent advising liberal construction of statutes that confer remedies in favor of the remedy. *See, e.g.*, *Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 916 (Minn. 2012) ("Generally, 'statutes which are remedial in nature are entitled to a liberal construction, in favor of the remedy provided by law, or in favor of those entitled to the benefits of the statute.'" (quoting *Blankholm v. Fearing*, 22 N.W.2d 853, 855 (Minn. 1946))); *see also Olson v. Push, Inc.*, 640 F. App'x 567, 570 (8th Cir. 2016) (unpublished per curiam); *Maust v. Maust*, 23 N.W.2d 537, 540 (Minn. 1946) ("[S]trict construction should not be pushed to the extent of nullifying the beneficial purpose of the statute, or lessening the scope plainly intended to be given thereto."). Indeed, "it is not unusual to extend the enacting words of a remedial statute beyond their literal import and effect in order to include cases within the same mischief, or within the reason of the statute." *Blankholm*, 22 N.W.2d at 855.

Here, the legislature clearly expressed its intent to protect producers of agricultural commodities from economic harm due to parent business entities using

their organizational form to avoid liability for their subsidiaries' actions. Ironically, should LLCs be excluded from the operation of the law due to the lack of amendment it will achieve the exact opposite without any meaningful rationale. Accordingly, we hold that the use of the phrase "corporation, partnership, or association" in the relevant statutes and Rule is intended to include LLCs for the purpose of parent-company liability.[14]

### III. *Conclusion*

For the foregoing reasons, we reverse the district court and remand for proceedings not inconsistent with this opinion.

_____

[14]We decline to consider the several alternative bases for affirmance that Pitman Farms offers in its brief. The district court did not address Pitman Farms's choice-of-law and dormant Commerce Clause arguments. While usually "a federal appellate court does not consider an issue not passed upon below," we have discretion not to follow the general rule when we think it appropriate. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). "The court may exercise its discretion to consider newly raised issues 'where the proper resolution is beyond any doubt, or where injustice might otherwise result, or when the argument involves a purely legal issue in which no additional evidence or argument would affect the outcome of the case.'" *Scott C. by & through Melissa C. v. Riverview Gardens Sch. Dist.*, 19 F.4th 1078, 1082 (8th Cir. 2021) (quoting *Universal Title Ins. Co. v. United States*, 942 F.2d 1311, 1314–15 (8th Cir. 1991)). Here, the resolution of these issues is not beyond all doubt; rather, they could benefit from additional argument before the district court. Moreover, injustice will not result because our holding today means that litigation will continue. Accordingly, we decline to address these issues and remand for further proceedings.