STATE OF MINNESOTA

IN SUPREME COURT

A23-0210

Court of Appeals                                                    Thissen, J.
                                          Took no part, Procaccini, Gaïtas, JJ.

In re the Estate of:
Joanne Mary Ecklund, Decedent.

                                                        Filed: May 7, 2025
                                                   Office of Appellate Courts

_____

Keith Ellison, Attorney General, Emily B. Anderson, Assistant Attorney General, Saint
Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Matthew D. Hough, Assistant County
Attorney, Minneapolis, Minnesota, for appellants Commissioner of Minnesota Department
of Human Services and Hennepin County Human Services.

Susan A. King, Taylor D. Sztainer, Mary Frances Price, Sara E. Filo, Moss & Barnett, P.A.,
Minneapolis, Minnesota, for respondent Jerry R. Ecklund.

David A. Rephan, Gary K. Luloff, Tea I. Baker, Chestnut Cambronne PA, Minneapolis,
Minnesota, for amicus curiae National Academy of Elder Law Attorneys—Minnesota
Chapter.

_____

S Y L L A B U S

Minnesota Statutes section 256B.15, subdivision 2(a)(1) (2024), allows the

Minnesota Department of Human Services to recover from the estate of a Minnesota

Medical Assistance Program recipient the amount of capitation payments paid on behalf of

1

the recipient to a managed care organization to provide long-term care services to the recipient after the recipient turned 55 years old.

Reversed.

O P I N I O N

THISSEN, Justice.

For several years, Joanne Ecklund received long-term care services through Minnesota's Medicaid program, the Minnesota Medical Assistance Program (MMAP).[1] The Minnesota Department of Human Services (DHS) paid for these services by making $66,052.62 in capitated payments—monthly prospective payments to cover the predicted cost of health care services—to Medica, Ecklund's managed care organization (MCO). In turn, Medica contracted with care providers to furnish Ecklund with long-term care services at a negotiated rate. Medica paid the providers $8,806.84 on Ecklund's behalf. Ecklund died in 2021.

Minnesota Statutes section 256B.15, subdivision 2(a)(1) (2024), authorizes appellant Commissioner of Human Services (the Commissioner) to recover from an MMAP recipient's estate the amount of payments DHS made for specified long-term care and services rendered to the recipient after she turned age 55. Such a claim is to be for "the amount of medical assistance rendered to recipients 55 years of age or older that consisted of nursing facility services, home and community-based services, and related hospital and

---

[1] MA is the more common abbreviation for the Minnesota Medical Assistance Program. Because this opinion involves defining the term "medical assistance," we use MMAP for clarity.

2

prescription drug services." *Id.* Under this statute, DHS (through Hennepin County) filed a claim against Ecklund's estate (the Estate) to recover the $66,052.62 in capitated payments for long-term care services made on Ecklund's behalf. DHS claimed that section 256B.15, subdivision 2(a)(1), allows it to recover the full amount of capitated payments made to Medica to provide Ecklund with the long-term care services she received. Respondent Jerry Ecklund, as Personal Representative for the Estate (the Personal Representative),[2] objected. The Personal Representative claimed that under section 256B.15, subdivision 2(a)(1), DHS's recovery is limited to the $8,806.84 Medica paid to Ecklund's service providers. The question we must resolve is whether section 256B.15, subdivision 2(a)(1), authorizes DHS to recover the amount of capitation payments paid on Ecklund's behalf to provide long-term care services as DHS sought, or whether the district court and court of appeals appropriately interpreted the statute as limiting DHS's estate-recovery claim to the $8,806.84 Medica paid for Ecklund's long-term care services.

**FACTS**

Congress enacted Medicaid in 1965 as Title XIX of the Social Security Act to provide medical care to those who otherwise could not afford it. 42 C.F.R. § 430.0; *see Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 9 (Minn. 2002). The Center for Medicare and Medicaid Services (CMS) oversees the federal Medicaid program. Medicaid is set up as a "cooperative" payment agreement between states and the federal government

---

[2] For clarity, in this opinion we refer to Jerry Ecklund as the Personal Representative. We refer to Joanne Ecklund by her last name.

in which both the federal government and state governments contribute funds to cover the costs of the program. *In re Schmalz*, 945 N.W.2d 46, 50 (Minn. 2020) (citing *Atkins v. Rivera*, 477 U.S. 154, 156–57 (1986)).

MMAP is Minnesota's Medicaid counterpart. Minn. Stat. §§ 256B.01, 256B.04 (2024). Because Minnesota opted into the federal Medicaid program, it must comply with federal law. *Martin*, 642 N.W.2d at 11; 42 U.S.C. § 1396a(a)-(b); Minn. Stat. § 256B.22 (2024) (stating that the MMAP is "intended to comply with and give effect to the program set out in title XIX of the federal Social Security Act"). Federal law requires that states recover certain funds paid on behalf of Medicaid recipients from the recipients' solvent estates after the recipients' deaths. 42 U.S.C. § 1396p. Minnesota references this federal law in its estate-recovery statute. Minn. Stat. § 256B.15 (2024). Indeed, since MMAP's enactment, Minnesota's governing statute has included estate-recovery provisions. Act of May 31, 1967, ch. 16, § 15, 1967 Minn. Laws 2067, 2074 (codified as amended at Minn. Stat. §§ 256B.01–.26 (2024)). The express legislative policy reflected in the estate recovery statute is for recipients to "use their own assets to pay their share of the cost of their care during or after their enrollment in the program according to applicable federal law and the laws of this state." Minn. Stat. § 256B.15. The specific provision at issue here is Minnesota Statutes section 256B.15, subdivision 2(a)(1), which provides, in relevant part, that DHS's claim shall only include "the amount of medical assistance rendered to recipients 55 years of age or older that consisted of nursing facility services, home and community-based services, and related hospital and prescription drug services."

4

Joanne Ecklund received Medicaid from 2006 until her death in 2021. From at least September 2016 to August 2021, Ecklund was enrolled in managed care through MMAP and provided with a network of care through Medica, her MCO. To provide a recipient with managed care, DHS pays the recipient's MCO a monthly rate, called a capitation payment. *See* Minn. R. 9505.5210 (2023) (defining "capitation rate" as "a method of payment for health care services under which a monthly per person rate is paid on a prospective basis to a health plan"); *see also* Minn. Stat. § 256B.69, subds. 5, 5b, 5f, 6(a)(2), 9 (2024). In exchange for the capitation payments, the MCO maintains a network of providers the recipient may use for care, negotiates reduced prices for those services, and reimburses the providers accordingly. DHS determines capitation payments based on the entire Medicaid population, risk-adjusted into broad categories of payment rates.[3] The capitation payments are not meant to perfectly capture the predicted cost of the health needs of a single individual. Minn. Stat. § 256B.6928, subds. 3(a)(1)–(2), 7(b) (2024). The

---

[3] Capitation payments are estimated monthly payments meant to capture the cost of providing care and services, including associated overhead costs and operating expenses. Minn. Stat. § 256B.6928, subd. 3 (2024). Because Minnesota "risk-adjust[s]," the monthly payment rate is based on the projected cost of providing care to the average person in a "rate cell"—a large, generalized demographic group within the MMAP population; it is not based on the projected cost of providing care to any single individual. *Id.*, subds. 2–3 (stating that "[t]he base data must be derived from the medical assistance population" and, after determining the base data, the Commissioner "select[s] a prospective or retrospective risk adjustment methodology"). Thus, DHS calculates (and periodically adjusts) the total monthly payment to an MCO by taking the risk-adjusted estimated cost of providing care for an average enrollee and multiplying by the number of enrollees for which the MCO provides services. *Id.* Importantly, in this case DHS does not seek to recover the *entire* amount of capitation payments DHS paid Medica on Ecklund's behalf, but only the actuarily-limited portion that relates exclusively to the cost of her long-term care services. In addition, the amount DHS seeks to recover does not include Medica's administrative overhead costs component.

individual capitation amount may be greater or less than the cost of the care and services provided to a specific recipient. Regardless, DHS is compelled to pay, and the MCO is bound by contract to accept, the capitated rate.

During Ecklund's managed care enrollment, she received medical care that qualified as long-term care services—hospital visit coverage, home health care, and prescription drug services. *See* Minn. Stat. § 256B.15, subd. 2(a)(1) (identifying "nursing facility services, home and community-based services, and related hospital and prescription drug services" as recoverable long-term care services). An actuarial analysis calculated that $66,052.62 of the total capitation payments DHS paid Medica during Ecklund's enrollment was attributable exclusively to estimated long-term care costs.[4] During this period, medical providers billed Medica over $113,000 for Ecklund's care. Based on the discounts Medica negotiated with those providers, however, Medica only paid the providers $8,806.84.

At the time of Ecklund's death, she left a solvent estate, including a home in Richfield which sold for $250,000. Hennepin County, on behalf of DHS and under the authority of section 256B.15, subdivision 2(a)(1), filed a Written Statement of Claim seeking to recover the full $66,052.62 of capitation payments attributable to Ecklund's long-term care services from the Estate. The Personal Representative disallowed the claim, asserting that the statute only allows DHS to recover the amount Medica paid Ecklund's

---

[4]    As noted above, *see supra* note 3, the capitated payments made by DHS on Ecklund's behalf exceeded the $66,052.62 at issue in this case. $66,052.62 is the portion (as determined by actuarial analysis) of the capitated payments allocated exclusively to long-term care costs. Further, the amount does not include Medica's overhead or targeted margins.

providers for long-term care services, $8,806.84.  Hennepin County then filed a petition in district court for Allowance of a Claim Previously Disallowed.  The Personal Representative objected.

A district court referee heard cross-motions for summary judgment on the stipulated facts.  The referee recommended granting the Personal Representative's summary judgment motion and the district court adopted the referee's recommendation.  Hennepin County appealed and the Commissioner intervened as of right.  *In re Est. of Ecklund*, 998 N.W.2d 308, 311 (Minn. App. 2023); *see* Minn. Stat. § 256B.15, subd. 9 ("The commissioner shall be permitted to intervene as a party in any proceeding involving recovery of medical assistance upon filing a notice of intervention and serving such notice on the other parties.").  The court of appeals affirmed the district court order, stating that the plain language of section 256B.15, subdivision 2(a)(1), limited DHS's estate-recovery claim to the $8,806.84 Medica paid for Ecklund's long-term care services, and not the capitation payments.  *Ecklund*, 998 N.W.2d at 314–15.  We granted review.

## ANALYSIS

The question before us is whether section 256B.15 authorizes DHS to recover from the Estate the $66,052.62 in capitated payments that DHS made to Medica for Ecklund's long-term care services or whether recovery is limited to the $8,806.84 Medica paid long-term care providers on Ecklund's behalf.

Because this appeal arises from the district court's grant of summary judgment based on undisputed facts, we review the decision de novo.  *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008).  The question before us is one of statutory

7

interpretation, which we also review de novo. *In re SIRS Appeal by Nobility Home Health Care, Inc.*, 999 N.W.2d 843, 851 (Minn. 2024).

The goal in interpreting a statute is to ascertain and effectuate the Legislature's intent. *Pfoser v. Harpstead*, 953 N.W.2d 507, 516 (Minn. 2021). We begin with the plain language, and, if there is only one reasonable interpretation of that language, we adopt that meaning. *Nobility*, 999 N.W.2d at 851. If, however, there is more than one reasonable interpretation, then the statute is considered ambiguous and we may apply additional canons of construction to determine its meaning. *A.A.A. v. Minn. Dep't of Hum. Servs.*, 832 N.W.2d 816, 819 (Minn. 2013).

The statute provides:

Subd. 2. Limitations on claims. (a) The claim shall include only:

(1)     the amount of medical assistance rendered to recipients 55 years of age or older that consisted of nursing facility services, home and community-based services, and related hospital and prescription drug services[.]

Minn. Stat. § 256B.15, subdivision 2(a)(1). Minnesota Statutes section 256B.02, subdivision 8 (2024), defines "medical assistance" as "payment of part or all of the cost of the care and services identified in section 256B.0625, for eligible individuals whose income and resources are insufficient to meet all of this cost." *See Wayzata Nissan, LLC v. Nissan N. Am., Inc.*, 875 N.W.2d 279, 286 (Minn. 2016) (stating that when a word is defined by statute, we apply that definition). While Minnesota Statutes section 256B.0625 (2024) contains a long list of categories of care and services MMAP covers, section 256B.15, subdivision 2(a)(1), provides that DHS may recover only the "amount of [payment of part or all of the costs of] nursing facility services, home and community-

8

based services, and related hospital and prescription drug services" rendered to a recipient during the period when the recipient was 55 years of age and older.[5]

A.

DHS's interpretation—that it should recover the portion of the capitation payments it paid Medica attributable to Ecklund's long-term care costs—is a reasonable and straightforward interpretation of the plain language of the statute. The statute provides for DHS to recover the amount of payments it made for the cost of Ecklund's long-term care services. DHS paid Medica capitation payments to provide Ecklund with long-term care services. Therefore, DHS's allowable recovery is the value of those capitation payments attributable to long-term care services.

This conclusion is consistent with the estate-recovery statute's expressly stated purpose. DHS runs MMAP with taxpayer dollars to provide care for those who cannot afford it. Minn. Stat. § 256B.01. The estate-recovery statute expressly and plainly states the purpose of estate recovery:

> It is the policy of this state that individuals or couples, either or both of whom participate in the medical assistance program, *use their own assets to pay their share of the cost of their care* during or after their enrollment in the program according to applicable federal law and the laws of this state.

Minn. Stat. § 256B.15, subd. 1 (emphasis added). Section 256B.15 further states that the claim for recovery from an estate belongs to DHS—the entity who used taxpayer money

---

[5] There is no dispute that Ecklund was eligible for and received covered services, that the State (through Medica) paid Ecklund's providers for these services, and that the State's recovery claim is limited to long-term care services Ecklund received after her 55th birthday.

9

to provide care. Minn. Stat. § 256B.15, subd. 1c(a) (stating that the claimant in an estate-recovery proceeding "shall be the state agency"); *id.*, subd. 1f (stating that a State agency's notice of claim against an estate constitutes a lien against that estate "in favor of the Department of Human Services"). Accordingly, allowing DHS to recover what it paid for Ecklund's care precisely matches the statute's aim as stated in its text. When considering the amount DHS is entitled to recover, the logical starting point is the amount DHS *paid*—here, the amount of its capitation payments to Medica.

The Personal Representative raises four objections to DHS's reading. First, the Personal Representative observes that the phrase "capitation payment" never appears in section 256B.15, subdivision 2, or, indeed, anywhere in section 256B.15. He claims it is impermissible, then, to allow recovery of capitation payments because we would be reading language into the statute that does not exist. *See Firefighters Union Loc. 4725 v. City of Brainerd*, 934 N.W.2d 101, 109 (Minn. 2019); *see also Ecklund*, 998 N.W.2d at 312–13 (offering the same reasoning).

We disagree. The word "payment" is incorporated into section 256B.15 through the statutory definition of medical assistance, which is applicable to the entire chapter. Minn. Stat. § 256B.02, subd. 8 (defining "medical assistance" or "medical care" as "*payment* of part or all of the cost of the care and services identified in section 256B.0625, for eligible individuals whose income and resources are insufficient to meet all of this cost" (emphasis added)). The language of section 256B.15 does not qualify or limit this definition in any way; it incorporates all types of payments. And a capitation payment is a type of payment under statute and rule. *See* Minn. R. 9505.5210 (defining "capitation rate"

10

as "a method of payment for health care services under which a monthly per person rate is paid on a prospective basis to a health plan"); Minn. Stat. § 256B.69, subd. 5 (describing the Commissioner's responsibility to "establish the method and amount of payments" for prepaid health plans, like managed care). Thus, "capitation payment" is included within the broader statutory term "payment." We do not need to add any words to the statute for it to cover capitated payments. Indeed, the Personal Representative's reading would *also* require us to add limiting language to the definition of "payment" in section 256B.15, something we refrain from doing. *State v. Beganovic*, 991 N.W.2d 638, 643 (Minn. 2023) (stating that "[w]e will not read into the statute any modifying or limiting language"). The canon that "we do not add words to the text of a statute" is simply not useful in this case.

The Personal Representative's second objection focuses on the words "rendered to recipients" in section 256B.15, subdivision 2(a)(1). He seems to argue that implicit in the phrase "rendered to recipients" (which he redefines as "provided to," "delivered to," "transmitted to"[6]) is a limiting factor that references only payments for care and services made *directly* to the recipient. Observing that capitated payments are never rendered directly to the recipient, but paid to the MCO, Minn. Stat. § 256B.03, subd. 1 (2024) (describing payments made to vendors, not recipients), the Personal Representative asserts

---

[6] The Personal Representative cites Black's Law Dictionary which defines "render" as "to transmit or deliver." *Render*, *Black's Law Dictionary* (11th ed. 2019). He also points to the court of appeals opinion which defines "render" as "to give" or "to provide." *Ecklund*, 998 N.W.2d at 313–14 (citing *The American Heritage Dictionary of the English Language* 1487 (5th ed. 2011)). Replacing the words the Legislature used—rendered to— with other possibilities like "transferred to," "delivered to," "given to," "transmitted to," or "provided to," sheds no light on—and is not particularly helpful in resolving—the question before us.

11

that the phrase "[t]he claim shall include only . . . the amount of medical assistance rendered to recipients" cannot mean "the claim shall include only . . . capitated payments rendered to recipients," because recipients never receive capitation payments.

This argument is misplaced because under MMAP, as the court of appeals recognized, recipients are never directly paid for long-term care services. *Ecklund*, 998 N.W.2d at 314. Indeed, the Personal Representative's own theory—that DHS's recovery is limited to the amount an MCO pays a provider—fails under this argument because no matter the type of payment at issue—a capitation payment or a payment for services rendered—the recipient (i.e., Ecklund herself) never directly receives payment.

The Personal Representative's argument based on the grammar of this phrase similarly fails. The Personal Representative points to the court of appeals' statement that "[t]he phrase 'rendered to recipients' modifies the phrase 'medical assistance' ['payment of part or all of the cost of the care and services identified in section 256B.0625'] because it immediately follows that phrase." *Id.* (citing *In re Est. of Butler*, 803 N.W.2d 393, 397 (Minn. 2011) (stating that, under the last antecedent canon, "a qualifying phrase ordinarily modifies only the noun or phrase it immediately follows")). According to the Personal Representative, this means that only payments for services rendered directly to a recipient are eligible for recovery from the recipient's estate. That is incorrect.

The work done by the words "rendered to recipients" in section 256B.15, subdivision 2(a)(1), is not to modify "medical assistance," i.e., "the cost of the care and services." Instead, the phrase "rendered to recipients" operates to *limit the categories* of

12

recipients from whom DHS can seek recovery.[7]  Minn. Stat. § 256B.15, subd. 2(a)(1) (stating the claim shall only include "the amount of medical assistance rendered to recipients *55 years of age or older that consisted of nursing facility services, home and community-based services, and related hospital and prescription drug services*" (emphasis added)).  As noted, "medical assistance" covers a vast array of care and services.  Minn. Stat. § 256B.0625.  The statutory language narrows the broad range of Medicaid care and services subject to estate recovery to those provided to certain recipients—those 55 years of age or older—and to a more limited set of services: "nursing facility services, home and community-based services, and related hospital and prescription drug services."  Minn. Stat. § 256B.15, subd. 2(a)(1).  Said differently, the words "rendered to recipients" must be read in the context of and connected with what *follows*: DHS may recover payments for the cost of the care and services, but only when the care and services are qualified long-term care services "rendered to recipients" age 55 and older.  *See Thompson v. St. Anthony Leased Hous. Assocs. II, LP*, 979 N.W.2d 1, 16 (Minn. 2022) (Thissen, J., dissenting) (cautioning against a piecemeal approach to reading a statute which plucks words out of a broader phrase).  Because Ecklund was over the age of 55 between 2016 and 2021 and received long-term care services, she is part of the limited group of recipients from whom DHS can recover.

---

[7]  The Personal Representative's position ignores that the focus of the text is on costs and not on the care and services.  Indeed, it is hard to understand what it would mean for DHS to recover "the care and services rendered to a recipient."

As a third objection, the Personal Representative insists DHS cannot recover capitation payments because the phrase "the cost of the care and services" as used in section 256B.15, subdivision 2(a)(1) (incorporating statutory definition of "medical assistance"), means the cost of the care and services actually rendered to the recipient, i.e., the amount Medica actually paid for services Ecklund received.

We are not convinced by this reading of the statute. To begin with, the concept of "actual cost" is itself inexact, as this case shows. Ecklund's providers set the cost of the services they provided at more than $113,000. But under Medica's negotiated rates—rates negotiated *because of the capitated payment/managed care approach to administering MMAP*—the cost of those services was reduced to just under $9,000. This significant difference, inherent in the MMAP system, demonstrates the difficulty in pinpointing "actual cost" for services, and the Personal Representative provides no basis or rationale for distinguishing which cost is the "actual cost."

In addition, the effect of the Personal Representative's argument is that section 256B.15, subdivision 2(a)(1), should read "[t]he claim shall include only . . . the amount paid to the provider for care and services *actually* rendered to the particular recipient" who is the subject of the estate-recovery proceeding. But the statute makes no reference to the "actual" cost of care; it refers to the "cost of the care and services" without any qualifiers or limitations. The Personal Representative's proposed interpretation impermissibly reads additional words into the statute. *See Firefighters Union*, 934 N.W.2d at 109. In this circumstance, the canon has force.

Moreover, even if we accept the Personal Representative's "actual cost" argument, it does not help him in this case. The capitation payment *is* DHS's cost for the care and services rendered to Ecklund. According to the Personal Representative, however, there are two (somewhat contradictory) reasons that a capitation payment is different from the "actual cost" of care. First, the Personal Representative asserts that a capitated payment includes both an estimated amount meant to cover the cost of the care and services a recipient receives (the benefit component) and an amount intended to cover associated operating, negotiating, and contractual expenses (the non-benefit component). The Personal Representative asserts that the Estate should not be responsible for Medica's administrative costs and, consequently, DHS cannot recover capitation payments. This argument, however, ignores the facts of this case. Although the capitated rate that DHS paid Medica for Ecklund's care included both benefit and the non-benefit components, the $66,052.62 that DHS is seeking to recover includes only the benefit component; it does not include Medica's associated overhead and administrative costs.

Second, the Personal Representative argues that because Medica's capitation payments were based on an *estimated* cost of care for generic MMAP enrollees in a particular rate cell, not the actual costs for Ecklund, it does not reflect the *actual* cost of the care Ecklund received. *Ecklund*, 998 N.W.2d at 313. But this argument equating "cost of the care and services" with "the amount paid to the provider for services actually rendered to the particular recipient" improperly assumes that we should view the cost of the care and services from the recipient's or the MCO's perspective rather than DHS's. *See Schmalz*, 945 N.W.2d at 50 (stating that in interpreting statutes, we " 'consider not only

15

the bare meaning of the word or phrase, but also its placement and purpose in the statutory scheme.' " (quoting *Goodman v. Best Buy, Inc.*, 777 N.W.2d 755, 758 (Minn. 2010))).

When Minnesota Statutes section 256B.15 is read in context, the statute provides a clear means for DHS to recover public funds put towards a recipient's long-term care when that recipient's estate has the means to reimburse those funds. DHS is explicitly granted the right to make such a claim. Minn. Stat. § 256B.15, subd. 1c(a) ("A state agency with a claim or potential claim under this section may file a notice of potential claim under this subdivision anytime before or within one year after a medical assistance recipient dies. The claimant shall be the state agency . . . ."). Therefore, it is logical to base the amount of recovery authorized on the amount DHS pays to provide a recipient's long-term care: the capitation payments.

The Personal Representative's fourth and final objection to DHS's interpretation of the statute is that subdivision 2 cannot in fairness allow for capitated payment recovery because there are instances, like this one, where the capitated payments are more than the amount the MCO pays to a recipient's providers. While it is true that capitated payments may sometimes be greater than the amount actually paid to providers, this case-specific result does not provide a basis to disregard the plain statutory language allowing DHS to recover the full amount it paid to provide Ecklund's care. Further, it will also be the case— most likely when the recipient is sicker or more vulnerable than the average recipient— that capitated payments are *less* than the amount an MCO pays a recipient's providers. In such a circumstance, it is difficult to understand why, under the logic of the Personal Representative's argument, DHS would and should not be allowed to recover from that

16

recipient's estate *more* than the capitated payments made to an MCO; a result which also seems like a windfall for DHS and unfair to that recipient and her beneficiaries.

This highlights a larger point: the Personal Representative's argument misunderstands how managed care—the system the Legislature adopted—works. DHS determines capitation payments based on the entire Medicaid population, risk-adjusted into broad categories of payment rates. They are not meant to perfectly capture the cost of the health needs of a single individual. *See* Minn. Stat. § 256B.6928, subds. 3(a)(1)–(2), 7(b). Instead, they are meant to balance out the range of needs among the population; some recipients will need care costing more than their capitation payments and some, like Ecklund, will need less. This is a design feature of the system, not a bug. There may be disagreement regarding whether administering managed care using capitated payments is the best policy, but those questions are for the Legislature and are beyond the scope of this case.

In summary, DHS's interpretation of section 256B.15, subdivision 2(a)(1)—that it is entitled to recover the amount of the capitated payments it paid Medica to provide Ecklund with long-term care services—is a reasonable interpretation of the statute.

B.

In contrast to DHS's reading of the statute, which focuses on the cost it incurred to provide Ecklund's long-term care services, the Personal Representative's interpretation of section 256B.15, subdivision 2(a)(1)—that the court of appeals adopted—could be characterized as a "services-oriented" reading: the claim shall include only the amount paid to providers for care and services and not the capitated rate paid by DHS to the MCO.

17

*Ecklund*, 998 N.W.2d at 314.  We are not convinced this is a reasonable reading of the statute for several of the reasons set forth above.

But even if we assume the Personal Representative offers a second reasonable interpretation of the statutory text that renders the statute ambiguous, upon considering several other non-text-based tools of statutory construction, we conclude that this "service oriented" reading is not correct.  *See State v. Wocelka*, 9 N.W.3d 390, 399 (Minn. 2024) (stating that when a "statute is ambiguous because there are two reasonable ordinary meanings of the [text], we turn to other non-textual clues to resolve the ambiguity").  We find considering DHS's historical understanding of the language—which is consistent with clear guidance from the federal government—and the potential adverse consequences associated with the Personal Representative's position to be particularly persuasive.

Assuming that the statute is ambiguous, we "may, but are not required to" defer to the relevant agency's interpretation of the statute.  *Nobility*, 999 N.W.2d at 855 (quoting *Matter of Den. of Contested Case Hr'g Reqs.*, 993 N.W.2d 627, 646 (Minn. 2023)).  We have done so if the subject matter requires highly technical or specialized knowledge, when the agency is tasked with administering the law, and where the interpretation is longstanding and reasonable.  *See, e.g.*, *id.*; *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater*, 731 N.W.2d 502, 513–15 (Minn. 2007).

Agency guidance is useful in this case.[8]  DHS is tasked with administering MMAP. Minn. Stat. § 256B.04.  The Legislature instructed DHS to cooperate with Centers for Medicare & Medicaid Services (CMS) and the federal government in "any reasonable manner" necessary to qualify for federal aid.  *Id.*; *see also* Minn. Stat. § 256B.22.  In addition, CMS publishes a State Medicaid Manual (the State Manual) which contains CMS's "interpretation of [federal] law and regulations, and, as such, [is] binding on Medicaid State agencies."  Ctrs. for Medicare & Medicaid Servs., No. 45, *The State Medicaid Manual*, Foreword § B.1 (2001).

---

[8]     The court of appeals concluded it could not rely on the federal law in assessing whether the statute is ambiguous—whether each of the competing interpretations were textually reasonable.  *Ecklund*, 998 N.W.2d at 312 n.3 (citing *Schmalz*, 945 N.W.2d at 50). We are not convinced that the court of appeals is correct, particularly in light of section 256B.15, subdivision 1, which provides as follows:

> [i]t is the policy of this state that individuals or couples, either or both of whom participate in the medical assistance program, use their own assets to pay their share of the cost of their care during or after their enrollment in the program *according to applicable federal law* and the laws of this state.

(Emphasis added); *see also* Minn. Stat. § 256B.22 (providing that "[t]he various terms and provisions hereof, including the amount of medical assistance paid hereunder, are intended to comply with and give effect to the program set out in title XIX of the federal Social Security Act").  These provisions are textual directives.  We have found other portions of federal law applicable pre-ambiguity when incorporated by statute, *see Schneider v. Child. Health Care*, 996 N.W.2d 197, 203–04 (Minn. 2023), or similar in purpose and construction, *see Henry v. Indep. Sch. Dist. #625*, 988 N.W.2d 868, 880, 885 (Minn. 2023). There are good reasons to conclude that the explicit language in Minn. Stat. §§ 256B.15 and 256B.22 allows us to consider pre-ambiguity the federal Medicaid provisions in determining whether a particular interpretation is a reasonable reading of a statute's text. But because it is neither dispositive nor necessary to resolve this question, we decline to do so.

The State Manual states:

Estate Recovery and Managed Care. — When a Medicaid beneficiary, permanently institutionalized, or age 55 or older, is enrolled (either voluntarily or mandatorily) in a managed care organization and services are provided by the managed care organization that are included under the State's plan for estate recovery, you must seek adjustment or recovery from the individual's estate for the premium payments in your claim against the estate. When the beneficiary enrolls in the managed care organization, you must provide a separate notice to the beneficiary that explains that the premium payments made to the managed care organization are included either in whole or in part in the claim against the estate.

- If you have elected in your State plan amendment to recover for all Medicaid services, then you must recover from the individual's estate the total capitation rate for the period the beneficiary was enrolled in the managed care organization.
- If you have elected in your State plan amendment to recover for some services covered under the State plan, but not all services, then *you must recover from the individual's estate that portion of the capitation payment that is attributable to the recoverable services, based on the most appropriate actuarial analysis determined by the State*.

*Id.* at § 3810.6 (emphasis added). This interpretation has been in effect since February 15, 2001, over 20 years.

The federal guidance is clear: DHS *must* recover capitation payments. If a state is moving to recover only a limited portion of medical assistance, as Minnesota does, it is required to recover the "portion of the capitation payment that is attributable to the recoverable services, based on the most appropriate actuarial analysis determined by the State." *Id.* This is exactly what DHS seeks to do here.

DHS has also embraced this interpretation. In the State Manual, DHS certifies that MMAP complies with federal law and regulations. *See* Dep't of Health and Hum. Servs.,

Ctrs. for Medicare & Medicaid Servs., Revision: HCFA-PM-95-3, TN 16-0007, State Plan Under Title XIX of the Social Security Act 53a § 4.17(b) (2016). By asserting compliance, DHS attested that section 256B.15 allows recovery of capitation payments attributable to the cost of long-term care services, consistent with CMS requirements.

DHS also publishes a separate MA Estate Recovery Manual which instructs Minnesota counties to recover capitation payments. *See In re Est. of Trahan*, No. A22-0494, 2022 WL 9612389, at *5 n.6 (Minn. App. Oct. 17, 2022) (containing a permalink to DHS's *MA Estate Recovery Manual* § IV.A.1 (2022)). In the portion labeled "Note about managed care paid amounts," DHS explains that counties are to recover the portion of capitation payments available after adjustment by actuarial formula as directed by CMS. *MA Estate Recovery Manual* § IV.A.1.[9]

We are not convinced by the Personal Representative's argument that section 256B.15's statutory history shows an intent to limit recovery to the amount paid to providers. When the Legislature initially enacted MMAP, it authorized DHS to claim "the total amount paid for medical assistance rendered" in seeking recovery from a recipient's estate. Act of May 31, 1967, ch. 16, § 15, 1967 Minn. Laws 2067, 2074 (codified as amended at Minn. Stat. §§ 256B.01–.26 (2024)). This made Minnesota an "all" recovery state. *See State Medicaid Manual*, § 3810.6 (describing two options for estate recovery:

---

[9] The record also shows that Ecklund, along with other MMAP recipients, received a notice letter in 2015 which informed her that DHS would recover "monthly payments to managed care plans for health care coverage" as part of estate recovery. While notice is not before us here, we can look to this letter as further evidence of DHS's intention to comply with the federal CMS guidance.

"all services" or "some, but not all, services").  The Personal Representative's statutory history argument focuses on the 2016 amendment to section 256B.15.  In 2016, the Legislature amended Minn. Stat. § 256B.15 to limit recovery to "the amount of medical assistance rendered to recipients 55 years of age or older and that consisted of nursing facility services, home and community-based services, and related hospital and prescription drug services."  *See* Act of June 1, 2016, ch. 189, art. 19, § 16, 2016 Minn. Laws 1, 278 (codified as amended at Minn. Stat. § 256B.15, subd. 2(a)(1) (2024)); *see also* Minn. Dep't of Hum. Servs., No. 17-21-02, *DHS Explains: Changes to MA Estate Recovery Resulting from CMS Approval of a Revised State Plan Amendment; and a New Statewide Funeral Expenses Policy* (the 2017 Bulletin) §II (2017) (stating that "the law change limited the type of [medical assistance] services that local agencies could recover in an estate claim . . . [s]pecifically, the law change . . . only [allowed] the costs of long term services and supports . . .").  Essentially, the 2016 amendment turned Minnesota from an "all services" to a "some, but not all, services" state for purposes relevant to this appeal.  The amendment limited the types of services for which DHS could seek estate recovery for non-institutionalized recipients of long-term care services.  But nothing about this amendment suggests that the Legislature intended to limit the type of *payments* DHS could recover.  The amendment says nothing about whether capitated payments are a type of payment that may be recovered.

For the same reasons, we determine that DHS's interpretation is longstanding and that the Personal Representative's argument to the contrary is not well-founded.  The Personal Representative makes no argument that recovery of capitation payments was not

22

authorized prior to the statutory changes and the issuance of the 2017 Bulletin.  Instead, relying on the 2017 Bulletin, the Personal Representative claims that the agency changed its position on capitation payments in 2017 when Minnesota amended its estate-recovery laws as discussed.  *See* the 2017 Bulletin.  For the reasons just explained, we do not agree.  The 2017 Bulletin summarizes the legislative changes that moved Minnesota from an "all services" jurisdiction to a "some, but not all, services" jurisdiction.  That change had nothing to do with whether capitated payments are appropriate.  In short, *both before and after* the 2017 Bulletin, DHS's position on the critical issue in this case—whether capitation payments are recoverable—remained the same.

Finally, we are concerned about the consequences the Personal Respondent's interpretation of section 256B.15, subdivision 2(a)(1), would have on Minnesota's Medicaid program.  *State v. Serbus*, 957 N.W.2d 84, 89 (Minn. 2021) (stating that we may look to the " 'consequences of a particular interpretation' " in our post-ambiguity construction of a statute (quoting Minn. Stat. § 645.16 (2020))).  To continue the cooperative funding agreement with the federal government, MMAP must comply with federal law.  42 U.S.C. § 1396c.  As explicitly stated in the State Manual, federal law requires recovering actuarially limited capitation payments.  To do otherwise could risk Minnesota's Medicaid funding and reduce DHS's ability to provide medical care for those who need it.

*    *    *

We conclude that under section 256B.15, subdivision 2(a)(1), DHS may recover the capitated payment amount it paid Medica to provide long-term care services to Ecklund after she turned 55 years old.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and direct the district court to award DHS $66,052.62 from Ecklund's solvent estate.


PROCACCINI, GAÏTAS, JJ., took no part in the consideration or decision of this case.

24